UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

                                      :

CHROME HEARTS LLC, a Delaware Limited Liability   :
Company,
                                        :

                      Plaintiff,          :                 21-cv-6858 (LJL)
                                        :

                   -v-               :          OPINION AND ORDER
                                        :

CONTROSE INC., a New York Corporation; BOB    :
KUNG, an Individual and DOES 1-10, inclusive,
                                        :

                   Defendants.    :

-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__8/8/2023___

LEWIS J. LIMAN, United States District Judge:

     Plaintiff Chrome Hearts LLC ("Chrome Hearts" or "Plaintiff") brings claims of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, false designation of origin and false descriptions under the Lanham Act, *id.* § 1125(a), unfair competition under New York common law, and trademark infringement under New York common law against defendants Controse Inc. ("Controse") and Bob Kung (together, "Defendants") for conduct infringing on three of Plaintiff's registered trademarks. Dkt. No. 27. Plaintiff seeks, *inter alia*, injunctive relief, a trebled award of all profits that Defendants derived from using the marks, costs and attorneys' fees, statutory damages pursuant to 15 U.S.C. § 1117, enhanced damages due to willful infringement, and punitive damages under New York law. *Id.* at ECF p. 17 ¶¶ 5–9.

     Defendants and Plaintiff now cross-move for summary judgment. Defendants move for summary judgment that: (1) Defendants are not liable for Plaintiff's claims of counterfeit; (2) any infringement was unintentional, not willful, and without malice and bad faith; (3) Plaintiff's unfair competition claim under New York common law be dismissed; and (4) punitive damages are unavailable. Dkt. No. 85. Plaintiff likewise moves for summary judgment on liability on its

trademark infringement and unfair competition claims, on the grounds that: (1) Plaintiff has valid and incontestable trademark registrations; (2) Defendants' offer for sale and sale of counterfeit, or confusingly similar, reproductions of the marks at issue is likely to cause post-sale confusion amongst consumers; and (3) Defendants acted with bad faith in purchasing and selling the infringing products.  Dkt. No. 92.

This seemingly simple case raises a number of complex issues concerning trademark law. For the following reasons, the Court grants in part and denies in part Plaintiff's and Defendants' motions on Plaintiff's trademark infringement claim under the Lanham Act, finding that there is no genuine dispute that Defendants have infringed Plaintiff's registered trademarks with respect to five of the six products at issue.  The Court also grants Plaintiff's counterfeit remedies with respect to those five products.  The Court denies Plaintiff's motions for summary judgment as to a sixth Accused Product.  The Court also grants Defendants' motion and denies Plaintiff's motion on the finding of bad faith; and grants Defendants' motion for dismissal of Plaintiff's unfair competition claim and that punitive damages are unavailable.

## BACKGROUND

The following facts are drawn from the parties' Rule 56.1 statements and the materials submitted in connection with the motion.  *See* Dkt. Nos. 98, 106.[1]  The facts are undisputed unless indicated otherwise.  All reasonable inferences are drawn in favor of the nonmovant.

---

[1] Plaintiff also submits several documents entitled "Plaintiff's objections to evidence" in response to evidence submitted in support of Defendants' moving papers.  *See* Dkt. Nos. 107, 115, 118.  Most of these objections are on the grounds of Federal Rules of Evidence 402 and 403, foundation grounds, "mischaracteriz[ing] testimony/evidence," with some others related to hearsay and failure to disclose an exhibit during discovery.  Most of them are frivolous, and many are not even evidentiary objections.  *See Emanuel v. Gap, Inc.*, 2022 WL 3084317, at *3 (S.D.N.Y. Aug. 3, 2022) ("Plaintiffs blew out of proportion their right to object, attempting to dissect Defendants' supporting affidavits line-by-line."); *Hallett v. Stuart Dean Co.*, 517 F. Supp. 3d 260, 267 (S.D.N.Y. 2021) (stating, with respect to an "Evidentiary Objections" document,

I.        **Chrome Hearts and Its Marks**

Plaintiff Chrome Hearts is an American luxury brand that has been designing,

manufacturing, and selling artistically styled leather goods, apparel, jewelry, and accessories

since 1988.  Dkt. No. 98 ¶ 1; Dkt. No. 105 ¶ 4.  Chrome Hearts' fashions have been

characterized as exuding a rockstar, alternative, and sometimes gothic appearance.  Dkt. No.

98 ¶ 6; Dkt. No. 105 ¶ 8.  Chrome Hearts sells a wide variety of artistic products, such as leather

pants, leather jackets, leather vests, sterling silver jewelry, fabric apparel, bags, and a wide

collection of other products, including furniture, eyewear, and crystal ware.  Dkt. No. 98 ¶ 2;

Dkt. No. 105 ¶ 5.  Its jewelry products include necklaces, bracelets, rings, wallet chains, and belt

buckles.  Dkt. No. 98 ¶ 2; Dkt. No. 105 ¶ 5.

Chrome Hearts® products are sold in exclusive CHROME HEARTS® stores and at

specialty boutiques throughout the world, including in the United States, the Caribbean, Asia,

and Europe.  Dkt. No. 98 ¶ 3; Dkt. No. 105 ¶ 6; Dkt. No. 105-1.  Retail stores in the United

States are located in Los Angeles, Malibu, Miami, Las Vegas, New York, Aspen, and Honolulu,

and retail stores in Asia include, but are not limited to, locations in Beijing, Chengdu, and

Hangzhou in mainland China.  Dkt. No. 105 ¶ 6; Dkt. No. 105-1.  Chrome Hearts has two stores

in Las Vegas with similar displays.  Dkt. No. 98 ¶ 4; Dkt. No. 105 ¶ 7.  One opened in The

---

that "[t]he volume is matched, moreover, by the frivolous nature of most (though not quite all) of
the objections").  Federal Rule of Civil Procedure 56(c)(2) permits a party to object that
"material cited to support or dispute a fact cannot be presented in a form that would be
admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  Plaintiff's objections thus are best understood
to claim either that an asserted fact is material, or that the evidence cited to support it creates a
genuine issue of fact.  The Court addresses the objections in that form.  The foundation grounds
are also denied, as "documents submitted in support of summary judgment may be considered if
a competent custodian *would be* able to verify their authenticity at trial."  *Emanuel*, 2022 WL
3084317, at *3 (emphasis in original); *see also id*. ("[E]vidence need not be submitted in trial-
admissible form on summary judgment, as long as it could be presented in that form at trial.").
The Court can also make its own judgment as to whether any statements mischaracterize
testimony or evidence.

Forum Shops at Caesars in October 2004 and the other opened at the Wynn Plaza in August 2019.  Dkt. No. 105 ¶ 7.  On the entrance wall of the store facing the outside, both stores have two large, sterling silver logos displaying Chrome Hearts' "Horseshoe Plus" mark, which features the name as well as the "CH Plus" mark at issue in this action.  *Id.*  The stores also feature glass windows; consumers can see some products and the store interior which feature the Chrome Hearts marks at issue in this case.  The Forum Shops' storefront has not changed and appears the same today.  *Id.*

Chrome Hearts is the owner of the word mark "CHROME HEARTS" and various composite trademarks comprising the word mark and assorted design components.  Dkt. No. 98 ¶ 7; Dkt. No. 105 ¶ 9.  The trademarks at issue here include the "CH Plus," "CH Cross," and "Dagger" marks as shown below (the "Marks").  Chrome Hearts owns federal trademark registrations for the Marks for goods and services which include various forms of jewelry.  Dkt. No. 105 ¶ 10; Dkt. No. 105-2.

| Chrome Hearts' Marks | U.S. Registration Number | Goods/Services |
|---|---|---|
| "CH Plus" | 3,385,449 | Jewelry, namely, rings, earrings, pendants, cuff bracelets, bracelets, necklaces, cuff links, watch bracelets, brooches and dog tags for wear by humans for decorative purposes. |
| "CH Cross" | 3,605,860 | Jewelry, namely, rings, earrings, pendants, necklaces, bracelets, cuff bracelets, cuff links, watch bracelets and key rings made of precious metals. |

| | 4,510,020 | Jewelry, namely, rings, earrings, necklaces, bracelets, cuff bracelets, brooches, cuff links, key rings, watch bracelets and tie fasteners. |
|---|---|---|
| "Dagger" | | |

Dkt. No. 105 ¶ 10.

Chrome Hearts was able to obtain the trademark registrations without proof of secondary

meaning.  Dkt. No. 98 ¶ 9; Dkt. No. 105 ¶ 11.  The U.S. Patent and Trademark Office

("USPTO") has deemed that the trademark registrations for the Chrome Hearts Marks have

become incontestable.  Dkt. No. 105 ¶ 11; Dkt. No. 105-3.

Chrome Hearts has been using the CH Plus, CH Cross, and Dagger marks on goods in

interstate commerce since 1988, 1989, and 1990, respectively.  Dkt. No. 98 ¶ 11; Dkt. No. 105

¶ 12.  Chrome Hearts has continuously used the marks in interstate commerce in connection with

the sale, distribution, promotion, and advertising of its goods since the marks' respective first

dates of use.  Dkt. No. 98 ¶ 12; Dkt. No. 105 ¶¶ 12–14; Dkt. Nos. 105-2 to 105-41.  Chrome

Hearts and its predecessors invest over $███████ per year in advertising, promoting, and

marketing the CHROME HEARTS® brand, much of which features the Chrome Hearts Marks.

Dkt. No. 98 ¶ 17; Dkt. No. 105-43.  Chrome Hearts also advertises throughout the world in select

high-end and artistic magazines, and works with magazines to feature editorial articles on

Chrome Hearts products.  Dkt. No. 98 ¶ 13; Dkt. No. 105 ¶ 14.  Chrome Hearts' sales from

products bearing the Chrome Hearts Marks exceed $███████ annually, with jewelry product

sales ranging from $███████ to $███████ annually.  Dkt. No. 105 ¶ 17.  Chrome Hearts

continues to sell jewelry products bearing the Chrome Hearts Marks to date.  Dkt. No. 98 ¶ 16;

Dkt. No. 105-42.  In the past five years, Chrome Hearts has filed approximately 156 lawsuits

against defendants who infringed upon the Chrome Hearts Marks.  Dkt. No. 98 ¶ 18; Dkt. No. 105 ¶ 19.

## II.      Controse and the Accused Products

Defendant Controse is in the business of designing and manufacturing stainless steel jewelry which it sells primarily through its online website as well as through other vendor websites.  Dkt. No. 104-3 at 16; Dkt. No. 106 ¶ 1.  Controse has two employees:  Defendant Kung, who is the founder and owner of Controse and started it as his hobby, and his assistant Christine Yeng.  Dkt. No. 86 ¶ 3; Dkt. No. 104-3 at 14–15; Dkt. No. 106 ¶¶ 2–3.  They have been operating their business for 10 years out of an office located in New York.  Dkt. No. 98 ¶ 20; Dkt. No. 104-3 at 16, 69–70.  Kung designs most of the products that Controse sells.  Dkt. No. 100 ¶ 3; Dkt. No. 104-3 at 20.  Controse manufactures its products in China, Dkt. No. 104-3 at 21, and does not carry any products that it does not manufacture, *id*. at 22.

Defendants sell their products at www.controse.com and also advertise their products on Instagram (@controse).  Dkt. No. 98 ¶ 21; Dkt. No. 104-3 at 18–19; Dkt. No. 104-4.  On their website, Defendants describe themselves as selling "tattoo inspired jewelry and accessories," stating that "[o]ur brand and pieces fit into your Althernative [sic] and Gothic style."  Dkt. No. 98 ¶ 22; Dkt. No. 104-4 at ECF p. 15.  The website further describes Controse's style as an "edgy, raw yet artful look – much like tattoos," that "make[s] you feel and look unique," and is "inspired by the popular tattoo styles and looks."  Dkt. No. 104-4 at ECF p. 15.

Defendants have never been a licensee or authorized retailer of CHROME HEARTS® products.  Chrome Hearts has never authorized Defendants to manufacture, advertise, distribute, offer for sale, and/or sell products bearing any of Chrome Hearts' trademarks and/or copyrighted works, including the Chrome Hearts Marks at issue.  Chrome Hearts has no affiliation with Controse.  Dkt. No. 98 ¶ 24; Dkt. No. 105 ¶ 20.

Through their website, Defendants have offered for sale and sold six (6) jewelry products named as "Fire Cross Punk Unisex Studs Leather Bracelet," "Cross-Bracelet," "Stainless Steel Flower Cross Earrings," "Patonce Cross Bracelet," "No Fear Steel Dagger Necklace," and "Flower Cross Bracelet."  Dkt. No. 98 ¶ 23 (collectively, the "Accused Products"); Dkt. No. 104-4.  The parties dispute whether these products bear identical and/or confusingly similar reproductions of one or more of the Marks.  Chrome Hearts claims that it examined some of the Accused Products and concluded that they were made of a cheaper material than that used in the sterling silver jewelry manufactured by Chrome Hearts and that they were not authentic Chrome Hearts® products.  Dkt. No. 98 ¶ 25; Dkt. No. 104-4; Dkt. No. 105 ¶ 21.  Cropped images of the Accused Products and the Plaintiff's products for comparison, identified by Plaintiff's briefing, are displayed below:



| Plaintiff's Product | Defendants' Product | Mark at Issue |
|---|---|---|
| | "Flower Cross Earrings" | CH Cross |
| | "Patonce Cross Bracelet" | |
| | "Cross-Bracelet" | |



"Flower Cross Bracelet"

"Flower Cross Punk Unisex Studs Leather Bracelet"

CH Plus

"No Fear Steel Dagger Necklace"[2]

Dagger

Dkt. Nos. 104-4, 105-4.

---

[2] Chrome Hearts owns the registration to the Dagger mark both with and without the "Chrome Hearts" inscription.  It asserts infringement based on the federal registration (Registration No. 4,510,020), Dkt. No. 105-2, without such inscription.

III.   **Kung's Procurement of the Accused Products**

In or about 2013, Kung first came to know of the Chrome Hearts "brand" when he visited and saw the store in Las Vegas, noticed the name, and saw that the company "was really big." Dkt. No. 98 ¶ 26; Dkt. No. 104-3 at 23–24.

In 2015, 2016, and 2019, Kung went to China to visit a factory manufacturing some of his products.  Dkt. No. 86 ¶ 4; Dkt. No. 104-3 at 53, 57.  While there, he went to a wholesaler building about an hour-and-a-half drive away to do research on product designs and specifically to research stainless steel products, including for their weight and quality.  Dkt. No. 86 ¶ 5; Dkt. No. 104-3 at 54, 59–60.  He visited two wholesale companies: (1) Jin Yan in June 2015 and January 2016, and (2) Steel Soldier 316L Jewelry Co., LTD ("Steel Soldier") in September 2015, January 2016, and October 2019.  Dkt. No. 86 ¶ 6; Dkt. No. 104-3 at 57; Dkt. No. 104-7 at ECF p. 2, 76.  During those three visits, he bought twenty stainless steel items in six different styles from the two companies for a total of $101.92 in cash.  Dkt. No. 86 ¶¶ 7–8; Dkt. No. 86-2.  He did not buy any other products from the companies.  Dkt. No. 104-3 at 55, 57.  He declared as to his understanding that he sought to buy amounts that would allow him to be exempt from any requirement to declare the items to U.S. customs.  Dkt. No. 106 ¶ 8.  He then offered those items for sale on www.controse.com.  Between October 2016 and March 2021, he sold only 14 out of the 20 items for a total of $298.71.  Dkt. No. 86 ¶¶ 9–10; Dkt. No. 104-3 at 26–27, 32–37, 44–46; Dkt. No. 104-7 at ECF p. 76.  Three of the 14 items were purchased by the Plaintiff's attorney in March 2021.  Dkt. No. 86 ¶ 10.  None of the items were advertised or described as Chrome Hearts products or held out as having designs belonging to Chrome Hearts.  *Id.* ¶¶ 13–14.  The name Chrome Hearts does not appear anywhere on the Controse website, the jewelry items at issue, or any of Controse's packaging.  *Id.* ¶ 16.  After 2016, Kung did not have any communications with Jin Yan.  He did not encounter Steel Soldier again until he bought the "No

Fear Steel Dagger Necklace" from Steel Soldier in October 2019.  Dkt. No. 104-3 at 62–63; Dkt. No. 104-7 at ECF p. 76.

Kung declares that he had no knowledge that Chrome Hearts or anyone else held a trademark in any of the designs of the 20 jewelry items.  Dkt. No. 86 ¶ 11.  He states that while he knew of the Chrome Hearts brand from his trip to Las Vegas, he had no knowledge prior to Plaintiff's suit of any Chrome Hearts individual designs, including those at issue in this case.  *Id*. ¶ 12.  He further claims Controse at no time intended to mislead or confuse consumers that this jewelry were Chrome Hearts products, and at no time did he ever believe that he was purchasing Chrome Hearts product or replica.  *Id*. ¶¶ 14–15, 17.  When Kung learned that there was a claim that these items allegedly infringed on the trademarks on Chrome Hearts, he immediately removed them from the website.  *Id*. ¶ 18.

## PROCEDURAL HISTORY

On August 13, 2021, Plaintiff filed its original complaint against Defendants and Does 1-10.  Dkt. No. 1.  On September 17, 2021, Defendants filed their answer with a jury demand.  Dkt. No. 8.  After discovering another allegedly infringing product, Plaintiff moved to amend its original complaint with a supporting memorandum of law, declaration, and proposed order.  Dkt. No. 21–24.  Defendants filed a response to the motion to amend on June 2, 2022, Dkt. No. 26, and two days later, the Court granted the motion, Minute Entry (June 4, 2022).  Plaintiff then filed its first amended complaint on June 6, 2022.  Dkt. No. 27.  Defendants filed their answer on June 16, 2022.  Dkt. No. 30.

The parties submitted their respective motions for partial summary judgment on September 12, 2022.  Plaintiff filed a notice of motion for partial summary judgment, a memorandum of law, a statement of material facts, two declarations, and a proposed order.  Dkt. Nos. 70–74.  Plaintiff also filed a motion to seal, Dkt. No. 69, and a notice of errata as to its

submission, Dkt. No. 80.  Defendants filed a similar notice of motion for partial summary

judgment, a statement of material facts, memorandum of law, and a declaration.  Dkt. No. 75.

Due to various filing errors, Defendant and Plaintiff both refiled various of their documents in

support of their motions on September 22, 2022.  Dkt. Nos. 85–97.[3]  On October 3, 2022,

Defendants filed their opposition to Plaintiff's motion for summary judgment, including a

memorandum of law, disputes to Plaintiff's statement of material facts, and two supporting

declarations.  Dkt. Nos. 98–101.  That same day, Plaintiff filed its opposition to Defendants'

motion for partial summary judgment, including a memorandum of law, two declarations, and

Rule 56.1 Counterstatement, Dkt. Nos. 102–06, 108–10, and a document entitled "Plaintiff's

Objections to Evidence Submitted in Support of Defendants' Motion for Partial Summary

Judgment."  Dkt. No. 107.  On October 4, 2022, Plaintiff filed a notice of errata for one of its

declaration in opposition to Defendants' motion.  Dkt. No. 111.

On October 11, 2022, the parties filed their reply memoranda of law in support of their

motions.  Dkt. Nos. 112, 113.  Plaintiff also included a reply affidavit and objections to evidence

submitted in support of Defendants' opposition to Plaintiff's motion for summary judgment.

Dkt. Nos. 114–15.  On October 12, 2022, Plaintiff then filed a compendium of cases cited in

support of Plaintiff's motion for partial summary judgment, a compendium of cases cited in

support of Plaintiff's opposition to Defendants' motion for partial summary judgment, and

another document of supplemental evidentiary objections to evidence submitted in defendants'

reply.  Dkt. Nos. 116–18.  On October 13, 2022, Defendant filed a corrected memorandum of

law.  Dkt. No. 121.  Also on October 13, 2022, Defendants filed a letter "objecting" to Plaintiff's

various submissions on "objections to evidence," Dkt. No. 119, and Plaintiff filed a response that

---

[3] The Court, for purposes of reference, refers to these documents when applicable.

same day, Dkt. No. 120.  On October 14, 2022, Defendants filed a response to Plaintiff's

response, Dkt. No. 122.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for

these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n

issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether

there are any genuine issues of material fact, the Court must view all facts "in the light most

favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir.

2001), and the movant bears the burden of demonstrating that "no genuine issue of material fact

exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible

evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."

*Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

"[A] party may not rely on mere speculation or conjecture as to the true nature of the

facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir.

2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).  Nor may the non-

moving party "rely on conclusory allegations or unsubstantiated speculation."  *F.D.I.C. v. Great*

*Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114

(2d Cir. 1998)).  Rather, to survive a summary judgment motion, the opposing party must

establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R.

Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The non-moving party must also demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).

## DISCUSSION

### I.   Trademark Infringement

The parties cross-move for summary judgment on Plaintiff's trademark infringement claims, with the parties disputing whether the Accused Products are counterfeit within the meaning of the Lanham Act.  Dkt. No. 87 at 4–14; Dkt. No. 93 at 10.  Plaintiff also moves for an order that the marks are valid.  Dkt. No. 93 at 9.  It further argues that the Accused Products are likely to confuse consumers in a post-sale context under the factors outlined in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961) ("*Polaroid*").  Dkt. No. 93 at 14–25.

"Under the Lanham Act, a plaintiff alleging trademark infringement must demonstrate that (1) it has a valid mark that is entitled to protection and that (2) the defendant's actions are likely to cause confusion with that mark." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020) (internal quotation marks omitted).

### A.   Validity of the Marks

Plaintiff moves for summary judgment that the marks are valid for the purposes of its trade infringement claim.  Dkt. No. 93 at 9.  Defendants argue that the marks "are simple and

resemble generic Celtic/gothic artwork and images." Dkt. No. 101 at 10.[4]  The Court concludes that the marks at issue are valid.

"To be valid and protectable, a mark must be capable of distinguishing the products it marks from those of others." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999).  A mark is entitled to protection if it is "inherently distinctive" or if it has acquired "secondary meaning." *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 390 (2d Cir. 1995).  Registration of the mark, in that respect, is "significant" and "confers important legal rights and benefits" that are "unavailable in the absence of federal registration." *In re Tam*, 808 F.3d 1321, 1329 (Fed. Cir. 2015), *aff'd sub nom. Matal v. Tam*, 582 U.S. 218 (2017) (quoting in part *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142–43 (2015)).  "Registration of a mark . . . entitles the owner to a presumption that its mark is valid." *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000).  "[T]he decision of the Patent Office to register a mark without requiring proof of secondary meaning affords a rebuttable presumption that the mark is suggestive or arbitrary or fanciful rather than merely descriptive." *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 (2d Cir. 1976) ("*Abercrombie*"); *see also Lane Cap. Mgmt., Inc.*, 192 F.3d at 345 ("Registration by the PTO without proof of secondary meaning creates the presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive.").  Furthermore, "[a] registered mark becomes incontestable if it has been in continuous use for five consecutive years subsequent to its registration and is still in use." *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.*, 991

---

[4] Although Defendants, in their opposition brief, do not appear to expressly contest the validity of Plaintiff's marks, they nonetheless argue that such marks are generic.  The Court construes that argument also as a challenge to the validity of the mark.  *See Tiffany & Co. v. Costco Wholesale Corp.*, 994 F. Supp. 2d 474, 480 (S.D.N.Y. 2014).

F.2d 1072, 1076 (2d Cir. 1993) (citing 15 U.S.C. § 1065).  "If a mark became incontestable, its registration 'shall be conclusive evidence . . . of the registrant's exclusive right to use the registered mark in commerce.'"  *Id.* (citing 15 U.S.C. § 1115(b)).  A holder of a valid registered trademark may sue in federal court to enforce its trademark and seek treble damages for willful infringement of the registered mark.  15 U.S.C. §§ 1117, 1121; *see also In re Tam*, 808 F.3d at 1329.

Even a "statutorily incontestable mark," however, can "be rendered invalid and cancelled" if "trademarked terms are, or have become, generic."  *Tiffany & Co.*, 994 F. Supp. 2d at 480–81 (quoting 15 U.S.C. § 1064(3)); *see also Sunrise Jewelry Mfg. Corp. v. Fred S.A.*, 175 F.3d 1322, 1326 (Fed. Cir. 1999) ("[T]he term 'generic name' as used in 15 U.S.C. § 1064(3), must be read expansively to encompass anything that has the potential but fails to serve as an indicator of source, such as names, words, symbols, devices, or trade dress.").  One such circumstance in which a statutorily incontestable trademark can be deemed to be generic is "'where a seller appropriates an existing generic term and claims exclusive rights in it as a "trademark" of that term,' but the term was generic before the seller used it and so the seller never had trademarked rights in it."  *Tiffany & Co.*, 994 F. Supp. 2d at 480 (quoting *Horizon Mills Corp. v. QVC, Inc.*, 161 F. Supp. 2d 208, 213 (S.D.N.Y. 2001)).  "A mark is understood to be generic if it 'refers, or has come to be understood as referring, to the genus of which the particular product is a species.'"  *Jackpocket, Inc. v. Lottomatrix NY LLC*, 2022 WL 17733156, at *28 (S.D.N.Y. Dec. 7, 2022) (quoting *Abercrombie*, 537 F.2d at 9).  "When a trademark owner sues for infringement of a registered and incontestable mark, the infringer bears the burden to rebut the presumption of the mark's protectability by a preponderance of the evidence."  *Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 193 F. Supp. 3d 245, 258 (S.D.N.Y.

2016), *aff'd*, 699 F. App'x 93 (2d Cir. 2017); *see also 20th Century Wear, Inc. v. Sanmark-Stardust Inc.*, 747 F.2d 81, 88 n.8 (2d Cir. 1984) (same).

It is undisputed that Plaintiff has been using the CH Plus, CH Cross, and Dagger marks on goods in interstate commerce since 1988, 1989, and 1990, respectively.  Dkt. No. 98 ¶¶ 11–12.  The marks were respectively registered in 2008, 2009, and 2014.  Dkt. No. 105-2.  The USPTO has deemed all three of the marks to be incontestable.  Dkt. No. 105-3.  Finally, it is undisputed that the USPTO registered all three trademarks without proof of secondary meaning.  Dkt. No. 98 ¶ 9.  The marks thus are entitled to a presumption that they are more than merely descriptive, *i.e.*, that they are distinctive.  Defendants bear the burden of rebutting this presumption.  *See Lane Cap. Mgmt., Inc.*, 192 F.3d at 345.

Defendants have not met this burden.  Defendants argue that the marks are generic and submit "examples of generic Celtic/gothic crosses found on multiple internet sites, which are very similar to Plaintiffs [sic] marks."  Dkt. No. 99 ¶ 3; Dkt. No. 99-2.  "The evidence used to show a term's common usage and understanding by the relevant public is varied.  Courts have relied upon evidence such as: (i) proof of widespread use by competitors that has not been contested by the seller; (ii) generic use by the seller himself; (iii) dictionary definitions; (iv) media usage, such as newspaper or magazine articles; and (v) consumer surveys."  *Horizon Mills Corp.*, 161 F. Supp. 2d at 214; *see also FragranceNet.com, Inc. v. Les Parfums, Inc*., 672 F. Supp. 2d 328, 333 (E.D.N.Y. 2009) (Bianco, J.) (describing a "non-exhaustive list of competent sources" which, in addition to the sources above, include "testimony of consumers or trade professionals").  "[I]t is unlikely that any of them, standing alone, will constitute conclusive proof that the contested mark has been appropriated by the public," *Horizon Mills Corp.*, 161 F. Supp. 2d at 214, and "[n]o single factor is dispositive," *Jewish Sephardic Yellow Pages, Ltd. v.*

*DAG Media, Inc.*, 478 F. Supp. 2d 340, 360 (E.D.N.Y. 2007). "The ultimate question is whether, in the absence of a mark that is inherently descriptive of the source of the product, there is circumstantial evidence that a substantial portion of the purchasing public associates the mark with the source of the goods." *Jackpocket, Inc.*, 2022 WL 17733156, at *33.

As a preliminary matter, Defendants' argument appears to be targeted only to the CH Plus and CH Cross marks; Defendants do not appear to be challenging the validity of the Dagger mark. The sole exhibit from Defendants shows what appears to be a Google search of a "gothic cross" in Google Images, two other websites showing crosses, and other images of gothic crosses that do not appear to be procured from the internet. Dkt. No. 99-2. The origin of these other images is unknown and there is no averment as to their source and their exposure to the public, let alone any purchasing members of the public. It is also unclear what the two websites are.[5] The Court is unable to discern whether they are competitors of Chrome Hearts, if they sell jewelry or other similar products to Chrome Hearts, or any information that would indicate that they are generally accessed by members of the purchasing public. Defendants have not submitted any such evidence. Finally, the Google image search appears to provide some ads from "Etsy" as to various "Christian" crosses, but none appear to be jewelry or apparel, and instead they appear to be advertising the sale of images. *Id.* No evidence is submitted as to what the "purchasing public perceives," as opposed to the general population, of the marks at issue. *Lane Cap. Mgmt., Inc.*, 192 F.3d at 345 ("[T]he relevant purchasing public is not the population at large, but prospective purchasers of the product."). In contrast, Plaintiff has submitted numerous exhibits in in which the CH Cross and CH Plus marks are featured prominently, either

---

[5] The websites are very pixelated and blurry, as submitted in the exhibit. The Court is unable to discern the URL or any other identifying information of the websites and Defendants provide no additional information on those websites.

as part of advertisements or other images accompanying other usage, such as articles.  *See generally* Dkt. Nos. 105-5 to 105-41.  Although it is entirely possible (and perhaps likely) that Defendants' averment that the CH Cross and CH Plus marks at issue are Celtic and Gothic symbols and are principally understood as such (and not as indicia that the product was created by Plaintiff) by the relevant purchasing public, the Court would have to speculate to reach that conclusion.  Defendants have provided no evidence to the Court sufficient to create a genuine issue of fact or from which a factfinder could determine by the preponderance of the evidence that Plaintiff's marks are generic.  *See*, *e.g.*, *Something Old, Something New, Inc. v. QVC, Inc.*, 1999 WL 1125063, at *5 (S.D.N.Y. Dec. 8, 1999) ("The terms in question may have been used historically to refer to certain types of jewelry, but defendants have not provided evidence that plaintiffs' marks have become generic, nor is there any showing of 'a strong indication of the general public's perception that the word is generic.'" (quoting *Harley–Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 811 (2d Cir. 1999))).

## B.  Likelihood of Confusion

The parties also cross move on the likelihood of confusion analysis.[6]  Defendants move only for summary judgment that they did not counterfeit Plaintiff's trademarks.  Dkt. No. 87 at

---

[6] The analysis of a "likelihood of confusion" is a "question of law" within this Circuit.  *See Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 326 n.4 (2d Cir. 2020) (stating that "[a]t an earlier time, we considered likelihood of confusion to be a question of fact.  Now, however, we . . . consider likelihood of confusion to be a question of law."); *but see id.* (noting that it is a question that may be in doubt due to the Supreme Court's decision in *Hana Financial, Inc. v. Hana Bank*, 574 U.S. 418 (2015)); *Reply All Corp. v. Gimlet Media, LLC*, 843 F. App'x 392, 395 (2d Cir. 2021) (same); *see also Gayle v. Villamarin*, 2021 WL 2828578, at *9 (S.D.N.Y. July 7, 2021), *report and recommendation adopted*, 2021 WL 4173987 (S.D.N.Y. Sept. 14, 2021) (rejecting the argument, in light of *Car-Freshner*, that there is a "question of fact as to the probable or actual actions and reactions of prospective purchasers of the goods" under "consumer confusion" prong of *Polaroid* analysis).

4–13.  Plaintiff moves on both the question of counterfeit, and in the alternative, that Defendants' marks create consumer confusion under the *Polaroid* analysis.  Dkt. No. 93 at 10–25.

The parties dispute the two legal requirements for a counterfeit claim.  First, Defendants contend that a "stitch-by-stitch" test governs whether a product is a "counterfeit" within the meaning of the Lanham Act and argue that the use of the marks fails that test.  Dkt. No. 87 at 10–14.  Second, Defendants argue that Plaintiff must show that "defendant intentionally used the mark at issue knowing it was counterfeit" and that there is insufficient evidence as a matter of law as to such intent.  *Id*. at 5–7.  Plaintiff argues that both standards are incorrect.  Dkt. No. 102 at 13–15, 17–19.  The Court first addresses the nature of the "counterfeit" claim and the competing arguments of the parties as to that claim.  Having concluded that the disposition of the counterfeit nature of the mark does not permit the Court to forego an analysis with respect to likelihood of confusion, the Court then turns to the question of whether the Accused Products present a likelihood of post-sale confusion with respect to Plaintiff's marks.

### 1.    The Standard for a Counterfeit Claim

#### a.    The Level of Identicality

In analyzing the respective arguments of the parties, the Court starts with the plain language of the Lanham Act, 15 U.S.C. § 1051 *et seq.*

Section 32 of the Lanham Act imposes civil liability on: "[a]ny person . . . [who] without the consent of the registrant -- (a) use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale . . . of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114(1)(a).  "[T]he Lanham Act does not provide for a separate cause of action for counterfeiting; rather, it provides for specific kinds of relief for trademark infringement claims based on the sale of counterfeit goods."  *Rovio Ent., Ltd. v. Allstar Vending,*

*Inc.*, 97 F. Supp. 3d 536, 545 n.2 (S.D.N.Y. 2015).   Thus, the notion of a "counterfeit" claim is somewhat of a misnomer, as "counterfeiting is merely an aggravated form of infringement." *Tiffany & Co.*, 971 F.3d at 95 n.18.  The Lanham Act allows a plaintiff to elect statutory damages for the use of counterfeit marks.  A defendant who uses a counterfeit mark in commerce is liable for statutory damages of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold . . . ."  15 U.S.C. § 1117(c)(1).  Where the use of a counterfeit mark is willful, the defendant is subject to statutory damages of "not more than $2,000,000 per counterfeit mark per type of goods or services sold . . . ."  *Id.* § 1117(c)(2).  As an alternative, if the defendant has "intentionally us[ed] a mark or designation, knowing such mark or designation is a counterfeit mark," the plaintiff may receive "three times" the amount of profits or its damages, whichever is greater.  *Id.* § 1117(b).[7]  The Lanham Act defines a counterfeit mark as a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark."  *Id.* § 1127; *see also id.* § 1116(d)(1)(B).

It follows from the plain language of the statute that a plaintiff seeking the enhanced form of relief available for the unauthorized use of a counterfeit must establish not only that the defendant's mark is a "counterfeit" within the meaning of the Lanham Act, but also that the defendant has used the challenged word, name, symbol or device as a mark, *see Tiffany & Co.*, 971 F.3d at 95 n.18, and that the defendant's use of that mark creates a likelihood of confusion,

---

[7] The Lanham Act also provides the victim of the use of a counterfeit mark powerful equitable remedies, including the availability of an *ex parte* order for the seizure of "goods and counterfeit marks involved in such violation."  15 U.S.C. § 1116(d).  Further, Section 526(e) of the Tariff Act of 1930 authorizes seizure by U.S. Customs and Border Protection of "[a]ny such merchandise bearing a counterfeit mark (within the meaning of [the Lanham Act])."  19 U.S.C. § 1526.

*see Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1079 (9th Cir. 2020) (holding that counterfeit claims require a showing of likelihood of confusion).

The parties spar over whether it is the registered mark or the products to which such mark is affixed that must be identical to assert a counterfeit claim.  They also spar over the standard to establish substantial indistinguishability and whether it requires "stitch-for-stitch" identicality. The language of the Lanham Act is clear that the counterfeit analysis looks to the similarity of the marks to determine whether enhanced relief is available, and not to the similarity of the goods or products to which the mark is attached.  Over and over, the Act distinguishes between a "counterfeit mark" and the goods or services which are sold with that mark.  *See, e.g.*, 15 U.S.C. §§ 1116(d), 1117(b), 1117(c)(1)–(2), 1127.   Section 1127 expressly notes that a "counterfeit" is "a spurious *mark* which is identical with, or substantially indistinguishable from, a registered *mark*."  15 U.S.C. 1127 (emphasis added).  The term "mark" is defined as including "any trademark, service mark, collective mark, or certification mark," with "trademark" defined as "any word, name, symbol, or device, or any combination thereof . . . to identify and *distinguish his or her goods*, *including a unique product*, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown."  *Id*.  The statute thus clearly delineates that the "marks" are distinct from the "goods" or "product[s]" on which they are affixed.  *Id*.  Nothing in the Lanham Act requires that the standard of "identical" or "substantially indistinguishable" apply to the products or goods.  *See Y.Y.G.M. SA v. Redbubble, Inc*., 2023 WL 4697350, at *7 (9th Cir. July 24, 2023) (noting that nothing in the text of the Lanham Act otherwise "require[d] counterfeit goods to be exact replicas of existing merchandise").[8]

---

[8] There is some authority to the contrary in this district, *see*, *e.g.*, *GTFM, Inc. v. Solid Clothing, Inc*., 215 F. Supp. 2d 273, 300 (S.D.N.Y. 2002) (noting that the use of certain marks was not

Admittedly, the word "counterfeit" is not a natural modifier to "mark."  The two words

sit awkwardly next to one another.  To repeat, the term "mark" includes a "trademark," which

"includes any word, name, symbol, or device, of any combination thereof used by a person . . . to

identify and distinguish his or her goods, . . . from those manufactured or sold by others and to

indicate the source of the goods, even if that source is unknown."  15 U.S.C. § 1127.  In the

common vernacular, one refers to "counterfeit products," as in a product being a knock-off of a

Gucci bag or a Tiffany necklace, and not to "counterfeit" marks.  A term that might operate as a

signifier of source in one context might just be an agglomeration of words or symbols in another;

marks don't have independent meaning, but take on their meaning from context and usage.  *See*

*Abercrombie*, 537 F.2d at 9 ("[A] term that is in one category for a particular product may be in

quite a different one for another.").  Were there nothing more to the Lanham Act, the definition

of "counterfeit mark" could be read to prohibit a senior user from preventing a junior user from

using even a weak mark as a source identifier for entirely distinct products sold in different

markets to different groups of customers.  It also could be read to permit a manufacturer to palm

off its product as the product of another with a far greater and longer brand identity so long as it

did so with a mark that was not identical to or substantially indistinguishable from that used by

its more senior competitor.

The necessary work is done by the remaining language of Section 32, which requires that

the mark not only be counterfeit, but that its use also give rise to a likelihood of confusion.

Under the Lanham Act, the similarity of the products goes to whether there is a likelihood of

---

"identical with, or substantially indistinguishable" because "Solid's sportswear was sufficiently
distinguishable to preclude liability for counterfeiting"); *Aris Isotoner Inc. v. Dong Jin Trading
Co*., 1989 WL 236526, at *10 (S.D.N.Y. Sept. 22, 1989) (describing counterfeit goods as "goods
that are identical to or substantially indistinguishable from the 'name' goods"), but none of that
authority parses the language of the Lanham Act.

confusion.  If the products are distant from one another, such that the consuming public would not equate one with coming from the source of the other, then no similarity or identity between the marks will suffice to establish a trademark infringement claim.  And because (as will be discussed below), Section 32 prohibits not only the use of a counterfeit of a registered mark but also a "colorable imitation" of a registered mark, a would-be infringer may not avoid Lanham Act liability by doing just enough to make sure its mark is not a counterfeit, while at the same time also doing enough to ensure that the consuming public will not know the difference.  In short, the identity of the products goes primarily to likelihood of confusion and not to the preliminary question whether the accused mark is a counterfeit or a colorable imitation.  "Where the marks are identical, and the goods are also identical and directly competitive," a conclusion of likelihood of confusion will follow.  *Topps Co. Inc. v. Gerrit J. Verburg Co.*, 1996 WL 719381, at *6 (S.D.N.Y. Dec. 13, 1996) (citing *Hard Rock Cafe Licensing Corp. v. Khurshid Int'l*, 1996 WL 507322, at *3 (S.D.N.Y. Sept. 5, 1996)).  And, even if the goods are not identical, a counterfeit claim may lie if the marks are identical and there is a likelihood of confusion.  If, however, one mark is not a counterfeit of another, the plaintiff is limited to ordinary Lanham Act relief.[9]

The parties dispute the appropriate standard to apply to a claim of counterfeit.  "A 'spurious' mark . . .  is one that is 'fake' and '[d]eceptively suggest[s] an erroneous origin.'" *Tiffany & Co.*, 971 F.3d at 95 n.18 (quoting Black's Law Dictionary (11th ed. 2019)). Defendants, drawing primarily from *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207

---

[9] For this reason, the Court rejects Defendants' contention that a "stitch-for-stitch" test applies to the comparison of the products for the purposes of determining Plaintiff's counterfeiting claim. *See Redbubble, Inc.*, 2023 WL 4697350, at *6–7 (rejecting use of "stitch-for-stitch" test in the context of a counterfeiting claim and instead holding that a likelihood of confusion test applies).

(S.D.N.Y. 2012), argue that a "stitch-for-stitch" standard applies for determining whether a product is counterfeit.  The court there, in somewhat loose language and without citation, stated that the counterfeit provisions of the Lanham Act apply to "products that are stitch-for-stitch copies of those of another brand."  *Id*. at 242.  The court reasoned that counterfeiting "seeks to trick the consumer into believing he or she is getting the genuine article, rather than a 'colorable imitation.'"  *Id*.  It stated that "courts have uniformly restricted trademark counterfeiting claims to those situations where entire products have been copied stitch-for-stitch.  I decline to expand this restriction, and conclude that Gucci's counterfeiting claim is more appropriately addressed under traditional infringement principles."  *Id*. at 253.[10]  More recent cases have pointed out that the *Gucci* court's statement that "entire products must be counterfeit . . . is far from clear [and] runs counter to the plain text of the Lanham Act."  *Louis Vuitton Malletier S.A.*, 97 F. Supp. 3d at 499; *see also Atari Interactive, Inc.*, 2022 WL 1601420, at *2 (calling into question the *Gucci* dicta and holding that the "question is whether the marks, not the goods, are substantially identical" (quoting *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F Supp. 3d 1000, 1027 (E.D. Wis. 2018))).[11]

_____

[10] Contrary to the statement of the *Gucci* court that "courts have uniformly applied this provision to products that are stitch-for-stitch copies of those of another brand," *Gucci Am., Inc.*, 868 F. Supp. 2d at 242, courts have regularly declined to require a "stitch-for-stitch" reproduction of the product for counterfeiting.  *See, e.g.*, *Rolex Watch, U.S.A., Inc. v. Michel Co*., 179 F.3d 704, 706 (9th Cir. 1999) (affirming a finding of counterfeiting where defendant reconditioned used Rolex watches with generic parts and sold them as genuine Rolex watches).  "[S]everal courts in this Circuit have found products to be counterfeit even if they were of inferior quality to the original." *Louis Vuitton Malletier S.A.*, 97 F. Supp. 3d at 499; *see also Atari Interactive, Inc. v. Teespring, Inc.*, 2022 WL 1601420, at *2 (N.D. Cal. Mar. 9, 2022) ("[T]he *Gucci* court did not cite any authority to support that conclusion, nor has Teespring pointed to any."); *see also id.* (stating that "'counterfeiting is a more specialized case of trademark infringement,' . . . not because counterfeiting requires an exact replica of the product").

[11] In *Montres Rolex, S.A. v. Snyder*, 718 F.2d 524 (2d Cir. 1983), in the course of concluding that the United States Customs Service acted arbitrarily and capriciously and not in accordance with

The language of the Lanham Act cannot be read to support a "stitch-for-stitch" test for the mark.  The Lanham Act defines counterfeit in the disjunctive—it must be "substantially indistinguishable" or otherwise "identical with" a registered mark.  15 U.S.C. § 1127.  A "stitch-for-stitch" recreation is synonymous with the phrase "identical with."  The statute, however, also provides that a counterfeit mark is one that is "substantially indistinguishable."  *Id*.  Applying the "stitch-for-stitch" test as the sole means of determining a counterfeit mark would render the terms "substantially indistinguishable" entirely superfluous.  *See Essilor Int'l SAS v. J.P. Morgan Chase Bank, N.A.*, 2023 WL 35176, at *10 (S.D.N.Y. Jan. 4, 2023) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009))).  Nor would it comport with the terms of the Lanham Act to read such a "stitch-for-stitch" standard into the term "spurious" in the definition of "counterfeit" in the Lanham Act.  That would render both "substantially indistinguishable" and "identical with" as superfluous.

The phrase "substantially indistinguishable" is not defined in the Lanham Act.  The legislative history of the provision provides guidance on the meaning of "substantially indistinguishable."  A Joint Congressional Statement on the 1984 Trademark Counterfeiting Legislation, agreed upon by sponsors of the relevant bills in both the Senate and the House, elaborates on the meaning of "substantially indistinguishable":

---

law in making a determination that a particular product was not counterfeit, the Second Circuit stated that "[a]n average purchaser would surely find the real and fake bracelets to be substantially indistinguishable."  *Id.* at 533.  But that language cannot be understood to establish, as law of this Circuit, that the appropriate question is whether the goods, and not the marks, are substantially identical.  The court in *Montres Rolex* was not confronted with the question of whether to apply the identicality standard to products or goods.  Indeed, the question was not before the circuit.  *See id.* (noting that it "d[id] not understand the government to have argued otherwise on appeal").

Under both the criminal and civil definitions, the term "counterfeit mark" refers to a mark or designation that is "identical with or substantially indistinguishable from" a genuine mark or designation. The definition of "substantially indistinguishable" will need to be elaborated on a case-by-case basis by the courts. *See, e.g.*, *Montres Rolex S.A. v. Snyder*, 718 F.2d 524, 530–32 (2d Cir. 1983), 104 S. Ct. 1594 (1984). Obviously, a mark need not be absolutely identical to a genuine mark in order to be considered "counterfeit." Such an interpretation would allow counterfeiters to escape liability by modifying the registered trademarks of their honest competitors in trivial ways. However, the sponsors do not intend to treat as counterfeiting what would formerly have been arguable, but not clear-cut, cases of trademark infringement.

For example, a manufacturer may adopt a mark for its goods that is reminiscent of, although certainly not "substantially indistinguishable from," a trademark used by the "name-brand" manufacturer of the product. Thus "Prastimol" might be used as the mark for a medication that is the functional equivalent of a product sold under the trademark "Mostimol." Whether or not this sort of imitation violates the Lanham Act or other provisions of law, it does not constitute use of a "counterfeit mark" for purposes of this bill.

Joint Congressional Statement on 1984 Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076–H12083 (Oct. 10, 1984), *as reprinted in* 7 McCarthy on Trademarks Appendix A8 (5th ed., June 2023 Update).

Following the reference in the legislative history to changes that are "trivial," courts in this district have coalesced on defining "substantially indistinguishable" when the "two marks [are] 'nearly identical . . . with only minor differences which would not be apparent to an unwary observer.'" *Louis Vuitton Malletier S.A.*, 97 F. Supp. 3d at 499 (quoting *Consol. Cigar Corp. v. Monte Cristi de Tabacos*, 58 F. Supp.2d 188, 196 (S.D.N.Y. 1999)); *see also One Hanover, LLC v. Witkoff Grp. LLC*, 2023 WL 3304026, at *4 (S.D.N.Y. May 8, 2023). The analysis requires one to consider not only the "marks in the abstract," but also "how they appear to consumers in the marketplace." *GTFM, Inc. v. Solid Clothing Inc.*, 2002 WL 1933729, at *2 (S.D.N.Y. Aug. 21, 2002). To assess a claim of counterfeit, "an allegedly counterfeit mark must be compared with the registered mark as it appears on actual merchandise to an average purchaser." *Colgate-Palmolive Co. v. J.M.D. All-Star Imp. & Exp. Inc.*, 486 F. Supp. 2d 286, 289 (S.D.N.Y. 2007);

*see also Montres Rolex, S.A.*, 718 F.2d at 533; *Illinois Tool Works Inc. v. J-B Weld Co., LLC*, 469 F. Supp. 3d 4, 9–10 (D. Conn. 2020) (citing cases).

A counterfeit mark is not one that is a "colorable imitation," in the sense that it "so resembles a registered mark as to be likely to cause confusion or mistake or to deceive." 15 U.S.C. § 1127; *see also Johnson v. Connolly*, 2007 WL 1151004, at *2 (N.D. Cal. Apr. 18, 2007). A finding of counterfeit requires "more than a mere similarity between the marks, or [more than] a 'colorable imitation.'" *One Hanover, LLC*, 2023 WL 3304026, at *4 (quoting *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 468 (S.D.N.Y. 2017)). The difference between a mark that is "likely to cause confusion" from one that is "substantially indistinguishable" from the registered mark may appear "more theoretical than real." *Montres Rolex, S.A.*, 718 F.2d at 531. But the two are distinct. The use of the name "Bolivia" as opposed to "Bulova" on a watch might be sufficient to give rise to a likelihood of confusion, but the two marks would not be substantially indistinguishable so as to give rise to counterfeit remedies. *Id.* (citing *In re Bulova Watch Co.*, C.S.D. 80-77, 14 Cus. Bull. No. 30 (July 23, 1980)). A counterfeit mark is "'fake' and '[d]eceptively suggest[s] an erroneous origin.'" *Tiffany & Co.*, 971 F.3d at 95 n.18. It "reflect[s] the element of outright duplication absent from the colorable imitation" inquiry. *Coty Inc*, 277 F. Supp. 3d at 468; *see also id.* ("Put another way, [t]he essence of counterfeiting is that the use of the infringing mark seeks to trick the consumer into believing he or she is getting the genuine article, rather than a 'colorable imitation.'" (internal quotation marks omitted)).

It bears noting that frequently in cases involving counterfeit marks, it may be "unnecessary to perform the step-by-step examination of each *Polaroid* factor." *Philip Morris USA Inc. v. Felizardo*, 2004 WL 1375277, at *5 (S.D.N.Y. June 18, 2004) (citing *Gucci Am.,*

*Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003)); *see also*, *e.g.*,

*Mattel, Inc. v. Arming*, 2021 WL 3683871, at *5 (S.D.N.Y. Aug. 18, 2021) (same);  *Fendi Adele*

*S.R.L. v. Filene's Basement, Inc.*, 696 F. Supp. 2d 368, 383 (S.D.N.Y. 2010) (same); *Burberry*

*Ltd. v. Euro Moda, Inc.*, 2009 WL 1675080, at *5 (S.D.N.Y. June 10, 2009) (same); *Edward B.*

*Beharry & Co. v. Bedessee Imports Inc.*, 2006 WL 3095827, at *2 (E.D.N.Y. Oct. 31, 2006)

(same); *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 455 (S.D.N.Y.

2005) (same).  That, however, will not invariably be the case, as it is not necessarily a foregone

conclusion—as it was in the previously cited cases—that use of the counterfeit marks is

"inherently confusing."  *Philip Morris USA Inc.*, 2004 WL 1375277, at *5.  The "counterfeit"

analysis alone is indifferent to the strength of the mark.  Because it looks solely to the likeness

between the challenged mark and the registered mark, the analysis does not necessarily turn on

the similarity of the products or the likelihood that the defendant will bridge the gap separating

its area of activity and that of the plaintiff.  Thus although a finding of a likelihood of confusion

may be presumed when "the goods are also identical and directly competitive," *Topps Co. Inc.*,

1996 WL 719381, at *6, it may be necessary in some cases to turn to the factors in this Circuit,

set forth in *Polaroid*, that are relevant to determining whether there is a likelihood of confusion.

*See Tiffany and Co.*, 971 F.3d at 84–85 (citing *Polaroid*, 287 F.2d at 495); *see also Arcona, Inc.*,

976 F.3d at 1078–79 (noting that while "perhaps . . . consumer confusion is generally not in

dispute in most counterfeit cases," "there is nothing in the statutory language of Section 1114

that suggests that a counterfeit claim should be construed differently from an infringement

claim").

### b.   Whether Intent is Required

The Court concludes—contrary to Defendants' argument—that intent is not required to

show that a mark is counterfeit.  Dkt. No. 87 at 5.  The Lanham Act does not require any

28

additional evidence of intent.  Nor does the Lanham Act permit one who copies verbatim the mark of another and then uses that mark to sell its products in commerce to defend on the grounds that its appropriation of the other's registered mark was unintended or accidental. Counterfeiting is "the hard core or first degree of" intellectual property offenses.  *Fujifilm N. Am. Corp. v. PLR IP Holdings, LLC*, 2019 WL 274967, at *3 (S.D.N.Y. Jan. 7, 2019).  It may be inferred that one who copies another's mark in all but trivial respects has acted with intent and not by accident.  But intent is not a prerequisite for finding that a mark is a counterfeit.

The Lanham Act expressly distinguishes relief between those uses of a counterfeit mark that are "intentional" and give rise to enhanced relief, and those uses that are not.  Under Section 35(b), a party is entitled to treble damages when it proves that the defendant "intentionally us[ed] a mark or designation, knowing such mark or designation [was] a counterfeit mark."  15 U.S.C. § 1117(b).  In the absence of such proof of intent, the plaintiff is limited to single damages or profits, or certain statutory damages for a non-willful violation.  It follows necessarily that to establish that a mark is counterfeit, the plaintiff need not show that the defendant knew that the mark was counterfeit or acted with intent.  With respect to single damages arising from a trademark infringement claim, "it is well established that wrongful intent is not a prerequisite . . . , and that good faith is no defense."  *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 25 (2d Cir. 2004) (citation omitted); *El Greco Leather Products Co. v. Shoe World, Inc.*, 806 F.2d 392, 396 (2d Cir. 1986) (noting that a defendant's "claimed lack of knowledge of its supplier's infringement, even if true, provides no defense"); *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 153 (E.D.N.Y. 2016) ("[T]he Lanham Act is a strict liability statute, a registrant need not prove knowledge or intent in order to establish liability."); *see also Abbott Lab'ys v. Adelphia Supply USA*, 2019 WL 5696148, at *6 (E.D.N.Y. Sept. 30, 2019)

(same); *Spin Master Ltd. v. Alan Yuan's Store*, 325 F. Supp. 3d 413, 421 (S.D.N.Y. 2018) (same).  And as for statutory damages, Section 35(c) allows for statutory damages for a counterfeit mark both with and without a finding of willfulness.[12]  The plain language of the section delineates the amount of damages between those violations that are willful and those for which the plaintiff is unable to show "that the use of the counterfeit mark was willful."  15 U.S.C. § 1117(c); *see also Innovation Ventures, LLC*, 176 F. Supp. 3d at 164 (distinguishing between "non-willful" and willful infringement for the two subsections of Section 35(c)); *see also Athena Cosms., Inc. v. AMN Distribution Inc*., 2022 WL 4596549, at *14 (C.D. Cal. Aug. 16, 2022) (describing § 1117(c)(1) as "baseline statutory damages . . . available without a showing of intent or knowledge"); *Photoscience Japan Corp. v. Pac. Ultraviolet Inc.*, 2021 WL 4775999, at *1 (C.D. Cal. Aug. 24, 2021) (distinguishing non-willful and willful damages); *Luxottica Grp. S.p.A. v. Zhiqiang Zhao*, 2017 WL 1036576, at *6 (N.D. Ill. Mar. 17, 2017) ("[§ 1117(b)] requires a finding of intent while [§1117(c)(1)] does not (unless the plaintiff is seeking enhanced damages pursuant § 1117(c)(2) which here it is not)."); *Stark Carpet Corp. v. Stark Carpet & Flooring Installations, Corp*., 954 F. Supp. 2d 145, 154 (E.D.N.Y. 2013) (same).

The absence of intent (as well as the fact that Plaintiff's miniscule profits and sales are discernible) is no doubt relevant as to where this case falls within the broad range of statutory damages available for a non-willful counterfeit violation.  *See* 15 U.S.C. § 1117(c) (statutory damages for non-willful violation range from $1,000 to $200,000 per counterfeit mark); *see also*

---

[12] Defendants' cited cases invoke statements of law traceable to outdated authority predating the 1996 amendments to the Lanham Act in The Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104–153, 110 Stat. 1386 (codified in part at 15 U.S.C. § 1117(c)).  That amendment allowed for statutory damages even when the use of a counterfeit mark was not willful.  *See* 15 U.S.C. § 1117(c).

*McGraw Hill LLC v. Doe 1*, 2022 WL 2979721, at *5 (S.D.N.Y. July 26, 2022) (noting that "aggregate sale evidence is an appropriate starting point" for statutory damages and emphasizing a finding of willfulness). However, intent need not be established to demonstrate that the injured Plaintiff is entitled to some amount of such damages for a counterfeit violation.

### 2.    Application

Plaintiff does not claim that Defendants copied any particular products of Plaintiff. Nor can the Court identify any products of Plaintiff in the record that are identical to the Accused Products. The Court thus first addresses whether the Accused Products create a likelihood of confusion sufficient to give rise to a Lanham Act claim for trademark infringement under the *Polaroid* factors. After determining that Plaintiff is entitled to judgment as a matter of law as to five of the six Accused Products, the Court then turns to the question of whether counterfeit remedies are available with respect to the use of the Marks on those products. The Court concludes that Plaintiff has shown the absence of a genuine issue of material fact and that it is entitled to judgment with respect to counterfeit damages for those five products. It concludes that an issue of fact exists with respect to the sixth Accused Product and that the outcome of Plaintiff's claim with respect to that product will have to await trial.

### a.    Whether There is a Likelihood of Confusion

The relevant factors to assesses the likelihood of confusion are those set forth in *Polaroid*:

> (1) the strength of the plaintiff's mark, (2) the degree of similarity between the two marks, (3) the proximity of the parties' areas of commerce, (4) the likelihood that the plaintiff will bridge the gap separating their areas of activity, (5) actual consumer confusion, (6) whether the defendant acted in bad faith or was otherwise reprehensible in adopting the mark, (7) the quality of the defendant's product, and (8) the sophistication of the relevant consumer group.

*Jackpocket, Inc.*, 2022 WL 17733156, at *26; *see also Tiffany and Co.*, 971 F.3d at 84–85 (citing *Polaroid*, 287 F.2d at 495). Weighing the *Polaroid* factors "is not a mechanical process where the party with the greatest number of factors weighing in its favor wins." *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) (quoting *Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 584 (2d Cir. 1993)). "No single factor is dispositive, nor is a court limited to consideration of only these factors." *Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 130 (2d Cir. 2004). "Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Paddington Corp.*, 996 F.2d at 584.

This case is atypical in that Plaintiff presses a claim only for post-sale confusion. The paradigmatic Lanham Act infringement claim is one in which the senior user of a mark claims that an appreciable number of ordinarily prudent purchasers are deceived either at the point of sale ("point of sale" confusion) or, if not confused at the time of purchase, "initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though these consumers are not actually confused at the time of purchase" ("initial-interest" confusion). *Coty Inc., LLC*, 277 F. Supp. 3d at 441 (quoting *Jordache Enters., Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 514–15 (S.D.N.Y. 1993)); *see also Empresa Cubana del Tabaca v. Culbro Corp.*, 2004 WL 602295, at *33 (S.D.N.Y. Mar. 26, 2004). Plaintiff does not argue that any actual purchasers of Defendants' products were deceived into believing that they were sourced from Plaintiff—either at the time the purchasers initially developed an interest in the products or at the time of the purchase. Defendants' website and advertisements where the Accused Products were offered prominently displayed the name "Controse." Dkt. No. 104-3 at 16; Dkt. No. 104-4. It did not display the name of Chrome Hearts. The packaging of the products, including the slip and jewelry bag, also bear the name "Controse" in capital letters with Controse's logo. Dkt. No.

90-1 at ECF p. 3; Dkt. No. 90-2.  Plaintiff's products are sold only at physical boutique stores or at its own physical stores.  Dkt. No. 98 ¶ 3; Dkt. No. 105 ¶ 6; Dkt. No. 105-1.  Defendants sold the Accused Products only through the internet and at a radically different price point.  Dkt. No. 104-3 at 16; Dkt. No. 104-4; Dkt. No. 106 ¶ 1; Dkt. No. 108 ¶ 19.

Rather, Plaintiff relies on a third form of confusion recognized in this Circuit that "can occur when a manufacturer of knockoff goods offers consumers a cheap knockoff copy of the original manufacturer's more expensive product, thus allowing a buyer to acquire the prestige of owning what appears to be the more expensive product."  *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc*., 219 F.3d 104, 108 (2d Cir. 2000); *see also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co*., 799 F.2d 867, 872 (2d Cir. 1986) ("[P]ost-sale confusion as to source is actionable under the Lanham Act."); *Coty, Inc.*, 277 F. Supp. 3d at 441; *Gucci Am., Inc. v. Guess?, Inc.*, 843 F. Supp. 2d 412, 418–19 (S.D.N.Y. 2012) ("The Second Circuit has recognized a claim for post-sale confusion for more than fifty years.").  It is irrelevant that the direct purchaser is unlikely to be confused.  *See T. Anthony, Ltd. v. Malletier*, 1993 WL 659682, at *3 (S.D.N.Y. Nov. 24, 1993) ("[E]ven if the direct purchaser of these goods were unlikely to confuse the source of the product because of the clearly delineated channels of trade, this does nothing to alleviate post-sale confusion as to the source of the goods.").  With post-sale confusion, the victim is not the individual who has purchased the junior user's product believing that it emanated from the senior user.  That person has arguably obtained a windfall, "achieving the status of owning the genuine article at a knockoff price."  *Hermes Int'l*, 219 F.3d at 109.  The victim of post-sale confusion, as the Circuit has described it, is the senior user itself who may suffer declines in the "sales of the originals . . . because the public is fearful that what they are purchasing may not be an original," and "the purchaser of an original [who] is harmed by the

widespread existence of knockoffs because the high value of originals, which derives in part from their scarcity is lessened." *Id.* at 108; *see also Gucci Am.*, 843 F. Supp. 2d at 418 (post-sale confusion "harms the owner of a trademark in that a potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, will choose to purchase that product instead of a genuine one in order to gain the same prestige at a lower price"). The victim also may be participants in the resale market who "may be deceived . . . if it requires expertise to distinguish between an original and a knockoff." *Hermes Int'l*, 219 F.3d at 108.

"[I]n this post-sale context [Defendant's] labels, most of which [will have] been long since discarded, will be of no help." *Lois Sportswear*, 799 F.2d at 873; *see also LeSportsac, Inc. v. K mart. Corp.*, 754 F.2d 71, 79–80 (2d Cir. 1985) (holding that district court did not err in failing to modify its injunction to permit alleged infringer to sell its bag accompanied by a hangtag prominently and accurately indicating its source of origin because "[o]nce the tag comes off, the bags are again virtually identical and likelihood of confusion remains"). "[P]oint-of-purchase displays and advertising do nothing to address the problem of post-sale confusion of non-purchasers." *Clinique Lab'ys, Inc. v. Dep Corp.*, 945 F. Supp. 547, 558 (S.D.N.Y. 1996); *see also Reebok Int'l Ltd. v. Sung Hwa Int'l Corp.*, 1987 WL 27684, at *2 (S.D.N.Y. Dec. 10, 1987) ("Therefore, it is irrelevant how different the packaging boxes are when the trademark on the sneaker is so similar as to probably cause confusion in the ordinary consumer regarding the product's manufacturer."); 1 Federal Unfair Competition: Lanham Act 43(a) § 3:17, Post-sale confusion (July 2023 Update) (for "post-sale confusion" cases, "some likelihood of confusion factors may be irrelevant, such as the degree of purchaser care, the difference in price between the parties' products, and the similarity between the parties' channels of trade," and "[a] potential defendant cannot dampen the likelihood of post-sale confusion by use of packaging material or

disclaimers").  Furthermore, that the plaintiff and defendant may sell their products through "distinct channels of trade [has] little or no bearing on post-sale confusion as to the source of the goods."  *Clinique Lab'ys, Inc.,* 945 F. Supp. at 554.  Finally, the sophistication of direct purchasers is largely immaterial when the only claim is brought for post-sale confusion, *see*, *e.g.*, *Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 389 (S.D.N.Y. 2008) ("[S]ophistication of direct purchasers does not necessarily bear on those who might be confused in the post-sale context."); *Malletier*, 1993 WL 659682, at *4  ("[T]he sophistication of direct purchasers has no effect upon the potential for post-sale confusion."); *see also Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 989 (Fed. Cir. 1993) (noting that the degree of care exercised by a purchasing consumer is "immaterial to the issue whether actionable confusion is likely to occur *after* the marked product has entered the public arena" (emphasis in original)).  Instead, "the sophistication of the general public taking note of these products should be considered."  *River Light V, L.P. v. Lin & J Int'l, Inc.*, 2014 WL 6850966, at *15 (S.D.N.Y. Dec. 4, 2014).

With these considerations in mind, the Court turns to the *Polaroid* analysis.  The Court concludes that summary judgment on liability for trademark infringement is warranted in favor of Plaintiff on five of the six Accused Products—the Flower Cross Earrings, Patonce Cross Bracelet, Cross-Bracelet, Flower Cross Bracelet, and Flower Cross Punk Unisex Studs Leather Bracelet—because those Accused Products create a likelihood of confusion in the post-sale context.  The CH Cross and CH Plus are inherently weak and Plaintiff, of course, is not entitled to a lock on all Gothic-style jewelry, but all three of Plaintiff's marks are entitled to a presumption of inherent distinctiveness and Plaintiff has submitted substantial proof of secondary meaning, to which Defendants have failed to respond.  Although they are sold at

different price points through different outlets, Plaintiff's and Defendants' products serve the

same function, giving risk to the likelihood that at least some customers will buy Defendants'

cheaper product for the purpose of acquiring Plaintiff's prestige and that Plaintiff's goodwill

both with its customers and with the general public will be degraded as a result.  *See Hermes*

*Int'l*, 219 F.3d at 109.  Summary judgment is denied, however, as to the No Fear Steel Dagger

Necklace because a jury could find it is not similar to Plaintiff's Dagger mark and is unlikely to

create a likelihood of confusion.  With respect to counterfeit, the Court concludes that the same

five Accused Products found liable for trademark infringement also bear counterfeit marks, and

that the No Fear Steel Dagger Necklace likewise does not bear a counterfeit mark.

### i.      Strength of the Marks

On the strength of the marks, Plaintiff argues that the marks are "arbitrary/fanciful"

because "a stylized plus sign, stylized cross . . . have no natural connection to jewelry products."

Dkt. No. 93 at 16.  It further argues that Chrome Hearts' marks are commercially strong because

of the length of use in connection with the sale, distribution, promotion, and advertising of its

goods.  *Id*. at 16–18.  Defendants argue that the marks are simply minimally stylized basics that

are only entitled to weak protection.  Dkt. No. 101 at 10.

 "[T]he task of the court in measuring the mark's strength is to determine 'its

distinctiveness, or its "origin-indicating" quality, in the eyes of the purchasing public.'"

*Jackpocket, Inc*., 2022 WL 17733156, at *30 (quoting *McGregor-Doniger Inc. v. Drizzle Inc*.,

599 F.2d 1126, 1131–32 (2d Cir. 1979)).  As previously noted, "[t]rademark law uses a four-

category typology to delineate the inherent distinctiveness of a mark: (1) generic, (2) descriptive,

(3) suggestive, and (4) arbitrary or fanciful."  *Id*. at *28.  Suggestive marks, while "notoriously

difficult to define," *id.*, "suggest (rather than directly describe) the product on which they are

employed, or its attributes, sometimes requiring imagination to grasp the linkage," *id* (quoting

*RiseandShine Corp. v. PepsiCo, Inc*., 41 F.4th 112, 121 (2d Cir. 2022)); *see also Abercrombie*, 537 F.2d at 10 ("A [mark] is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods.  A [mark] is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.").  "A finding of suggestiveness does not guarantee a determination that the mark is a strong one." *Jackpocket, Inc*., 2022 WL 17733156, at *30 (quoting *RiseAndShine Corp*., 41 F.4th at 121).  "[A]rbitrary and fanciful marks 'make no logical reference to the product or service on which they are used.'" *Id*. at *28 (citation omitted).

Although "[u]nshaded linear representations of common shapes or letters are . . . 'basic,'" "stylized letters or shapes are not 'basic,' and are protectable when original within the relevant market." *Star Indus., Inc. v. Bacardi & Co*., 412 F.3d 373, 383 (2d Cir. 2005).  However, if the stylization is "marginal at best" and is otherwise "ordinary," the result is "'thin' or weak mark, which will be entitled to only limited protection." *Id*.  For a mark to be sufficiently "stylized" to have inherent distinctiveness, the design must not be "commonplace" but rather "unique or unusual in the relevant market." *Id*. at 382.  "The guiding principle in distinguishing protectable from unprotectable marks is that no one enterprise may be allowed to attain a monopoly on designs that its competitors must be able to use in order to effectively communicate information regarding their products to consumers." *Id*.; *see also River Light V, L.P*., 2014 WL 6850966, at *9; *New Look Party Ltd. v. Louise Paris Ltd*., 2012 WL 251976, at *5 (S.D.N.Y. Jan. 11, 2012); *Artisan Mfg. Corp. v. All Granite & Marble Corp.*, 559 F. Supp. 2d 442, 449 (S.D.N.Y. 2008); *cf. Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 244 (5th Cir. 2010).

This factor weighs in favor of Plaintiff.[13]  Defendants have not rebutted the presumption

that the marks are suggestive or arbitrary or fanciful rather than merely descriptive because the

USPTO registered the marks without requiring proof of secondary meaning.  *See supra* Section

I.A; *see also Abercrombie*, 537 F.2d at 11 (describing the presumption arising from registration

without secondary meaning).  A finding of suggestiveness, however, does not necessarily lead to

the conclusion that the mark is strong.  *See RiseAndShine Corp.*, 41 F.4th at 121.  The CH Cross

and the CH Plus marks are minimally stylized.  The CH Cross and CH Plus marks are curved

variations of standard cross and a "plus" sign, which is a different form of a cross.  While the

lines are curved and are "the product of design efforts," *Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400,

416 (S.D.N.Y. 2012), the stylization is "marginal," as the arms are otherwise uniform in

appearance aside from their length, crosses are an otherwise basic and elementary figure, and

there are no other distinguishing characteristics with respect to shading or borders.  *See, e.g.*, *Star

Indus., Inc.*, 412 F.3d at 383 (noting that an "O" was sufficiently stylized to be inherently

distinctive, but was otherwise ordinary); *Lopez*, 883 F. Supp. 2d at 416; *Artisan Mfg. Corp.*, 559

F. Supp. 2d at 450 (finding a fleur de lis shape to be minimally stylized).  Defendants assert that

the marks "resemble generic Celtic/gothic artwork and images" and therefore are not protectable.

Dkt. No. 101 at 10.  But that is a conclusion.  The Court has already addressed and dismissed this

argument in Section I.A as to the CH Plus and CH Cross marks.  For the purpose of this

particular *Polaroid* factor, the Court again notes that, perhaps because of the minimal amount at

stake in this action, Defendants have not put forward anything in the record to show that the

---

[13] The Court assumes, but does not decide, that the CH Cross and CH Plus marks at issue here
are suggestive, and not "arbitrary and fanciful."  The Court need not address Plaintiff's
contentions that its marks are "arbitrary and fanciful" to determine that even if they were only
weakly suggestive, Plaintiff has succeeded in showing that there was acquired strength to the
marks.

"design is common place" and not "unique or unusual *in the relevant market*," *Star Indus., Inc.*, 412 F.3d at 382 (emphasis added)—which, here, is the jewelry market.  Defendants state no facts in their Rule 56.1 Statement, nor provide any evidence, that would allow the Court to conclude— as numerous courts facing arguably similar circumstances have—that a certain design is commonplace.  *See, e.g.*, *Amazing Spaces, Inc.*, 608 F.3d at 246–47 ("The record evidence is replete with similar or identical five-pointed stars, both raised and set in circles, and used in similar manners, such that—notwithstanding the residual evidence of the presumption of validity—no reasonable jury could find that the Star Symbol is even a mere refinement of this commonly adopted and well-known form of ornamentation."); *Wiley v. Am. Greetings Corp*., 762 F.2d 139, 142 (1st Cir. 1985) (pointing to record evidence that "[u]sing a red heart as ornamentation for stuffed animals is also far from unique or unusual"); *Lopez*, 883 F. Supp. 2d at 416 ("[T]he LES Mark's design—utilizing the letters of an acronym in an interlaced pattern—is common in the apparel industry; it appears on many t-shirts, caps, and sweatshirts."); *Artisan Mfg. Corp*., 559 F. Supp. 2d at 451 ("Although AGM has provided evidence that other corporations have registered marks including a fleur de lis design, only one is in the same industry as Artisan, and that mark features a horse and shield design along with the fleur de lis. This is insufficient to show that the Fleur De Lis Mark is common in the relevant market place."); *see also Seabrook Foods, Inc. v. Bar–Well Foods, Inc*., 568 F.2d 1342, 1344 (C.C.P.A. 1977).  Defendants thus present no genuine dispute of material fact that the CH Plus and CH Cross marks are inherently distinctive.  But because they are only minimally stylized, they are "thin" or "weak" and only entitled to limited protection.  *Star Indus., Inc*., 412 F.3d at 383.

Even then, "[a] weak suggestive mark can acquire distinctiveness through 'public recognition in the marketplace, sometimes called acquired strength.'"  *Jackpocket, Inc*., 2022

WL 17733156, at *33 (citation omitted).  "Analysis of whether a mark has acquired meaning

requires consideration of factors such as: (1) advertising expenditures; (2) consumer studies

linking the name to the source; (3) sales success; (4) unsolicited media coverage of the product;

(5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use."  *Id.*

(citing *Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985)).  With the exception

of consumer studies—which no party has submitted—the remainder of the factors all weigh in

favor of Plaintiff.  It is undisputed that Chrome Hearts has continuously used the CH Plus, CH

Cross, and Dagger marks on goods, and in connection with their sale, distribution, promotion,

and advertisement, since 1988, 1989, and 1990, respectively, Dkt. No. 98 ¶¶ 11–12; Dkt. No.

105 ¶¶ 12–14; Dkt. Nos. 105-2 to 105-41.  Chrome Hearts and its predecessors invest over $██

██████ per year in advertising, promoting, and marketing the CHROME HEARTS® brand,

much of which features the Chrome Hearts Marks.  Dkt. No. 98 ¶ 17; Dkt. No. 105-43.  Chrome

Hearts' sales from products bearing the Chrome Hearts Marks exceed $████████ annually,

with jewelry product sales ranging from $█████████ to $█████████ annually, although it appears

that the Dagger mark constitutes the smallest portion of these sales.  Dkt. No. 98 ¶ 16; Dkt. No.

105-42.  In addition, Chrome Hearts has filed approximately 156 lawsuits against defendants

who allegedly infringed upon the Marks.  Dkt. No. 98 ¶ 18; Dkt. No. 105 ¶ 19.  Finally, although

the record is unclear as to the degree of which the press coverage is solicited, Chrome Hearts

works with magazines on editorial articles featuring Chrome Hearts products.  Dkt. No. 98 ¶ 13;

Dkt. No. 105 ¶ 14; Dkt. No. 105-5.  Defendants have challenged none of these facts.  Those

undisputed facts are sufficient to support the strength of Plaintiff's marks and to conclude that

this factor weighs in favor of Plaintiff.  *See New Look Party Ltd.*, 2012 WL 251976, at *6

(finding distinctiveness of a design mark in a relevant market place based on the creation of

secondary meaning); *Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141, 159 (S.D.N.Y. 2011), *aff'd*, 508 F. App'x 31 (2d Cir. 2013) (assessing the factors); *cf. Lopez*, 883 F. Supp. 2d at 420 (finding that there was a lack of evidence otherwise for a minimally stylized mark and thus concluding that the strength factor weighed in favor of defendants).

### ii.       Similarity of the Marks

Plaintiff contends that, in a post-sale context, the marks are similar and any differences are diminished because the type of goods—jewelry—are the same.  Dkt. No. 93 at 18–20. Defendants contend that the Dagger mark is different than that depicted on the No Fear Steel Dagger Necklace.  Dkt. No. 101 at 11.  Although Defendants do not appear to specifically address the CH Cross and CH Plus marks under the similarity prong, *id.*, Defendants separately argue that there are differences in the "band, chain, and additional designs incorporated into the product," *id.* at 5.  The Court concludes that, except for the Dagger Mark, this factor also weighs in favor of Plaintiff.

"The similarity of the marks factor requires the court to look beyond . . . the mark and 'analyze the mark's overall impression on a consumer, considering the context in which the marks are displayed.'"  *Jackpocket, Inc.* 2022 WL 17733156, at *39 (quoting *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 117 (2d Cir. 2006)).  "The fact that the two marks appear similar is not dispositive.  Rather, the question is whether such similarity is more likely than not to cause consumer confusion."  *Brennan's, Inc.*, 360 F.3d at 133.  "The court must consider both the similarity of the names and the manner of their presentation to the public to determine whether confusion is likely to result."  *Procter & Gamble Co.*, 485 F. Supp. at 1197.  There are only minor differences in how the marks are integrated and appear on the Accused Products.  For example, with respect to the CH Cross, the crosses on the Patonce Cross Bracelet and the Cross-Bracelet are overlaid on a perforated black metal background.  That

background also accompanies the Flower Cross Bracelet as well, which bears the counterfeit CH Plus Mark.  The Cross-Bracelet further features a border encircling the cross, which is not exhibited in Plaintiff's products.  The Flower Cross Punk Unisex Studs Leather Bracelet also surrounds the mark with a border.  These differences, however, are unlikely to diminish any difference in the "general impression conveyed to the public."  *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 582 (2d Cir. 1991).  All of the Accused Products fall within the Gothic style that has been characteristic of Plaintiff's aesthetic.  All use silver-colored schemes, the patterns of the chain links are similar, and the designs overall reflect a Gothic or punk aesthetic.  *See Gucci Am., Inc. v. MyReplicaHandbag.com*, 2008 WL 512789, at *1 (S.D.N.Y. Feb. 26, 2008) (identifying counterfeit goods when the "same color schemes, patterns and designs" were used).  It is also undisputed that Chrome Hearts sells numerous products in that style, any of which carry one or a combination of the CH Plus or CH Cross marks.  Dkt. No. 105-4.  Some of these products also include the marks on black or dark backgrounds, which bears likeness to the perforated dark metal background of some of the Accused Products.  *Id.*  Some of the marks on Chrome Hearts products also have borders as well.  *Id.*  Like the Accused Products, there are also sometimes additional marks that accompany the Marks at issue.  *Id.*  An average consumer viewing the marks on the Accused Products—products which are of the same style, aesthetic, and color scheme as those of Plaintiff—could not ascribe any significance to the slight ways in which they differ.  This factor again cuts in favor of Plaintiffs on the CH Cross and CH Plus marks.

Defendants are correct, however, that there are significant differences in the Dagger mark.  This Court has concluded that the Dagger mark and the Accused Product at issue—the No Fear Steel Dagger Necklace—is sufficiently differently such as to not be a counterfeit mark.  *See infra* Section I.B.2.b.  In addition to those differences, the only uses of the Dagger mark that the

Court can glean from the record is its attachment to a bright green lanyard, *see* Dkt. No. 105-4 at ECF p. 7, as part of a silver bracelet with several other accompanying marks and designs, *id.* at ECF p. 8, and as a free-floating pendant, *id.* at ECF p. 57.  The only example in which the Dagger mark is also used on a necklace is on a bright green lanyard.  The No Fear Steel Dagger Necklace, in contrast, uses an unadorned chain with the appearance of silver as its necklace. Plaintiff's bracelet bearing the Dagger mark, *id.* at ECF p. 8—to the extent it is comparable at all to the Accused Product—is punctuated by both the CH Plus marks and several dangling CH Cross marks in silver.  Those sparse examples of the use of the Dagger mark—in combination with the distinct differences in lettering on the hilt of the blade, the various markings on Defendants' blade, and the overall proportion and design of the various portions of the "dagger" (such as its handle), are sufficient to cut this factor in favor of Defendants on the Dagger Mark and the No Fear Steel Dagger Necklace.

### iii.   Proximity of the Products and Bridging the Gap

As a general matter, and particularly in the initial interest and point-of-sale contexts, the proximity of the products factor "concerns whether and to what extent the two products compete with each other" and "look[s] to the nature of the products themselves and the structure of the relevant market."  *Cadbury Beverages, Inc. v. Cott Corp*., 73 F.3d 474, 480 (2d Cir. 1996) (internal quotation marks and citation omitted).  "[T]he closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source."  *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 150 (2d Cir. 2003); *see also La Cibeles, Inc. v. Adipar, Ltd*., 2000 WL 1253240, at *7 (S.D.N.Y. Sept. 1, 2000) ("[C]ourts should consider whether the products serve the same purpose and whether they share similar geographic distribution, market position and audience appeal." (internal quotation marks and citation omitted)).  "In examining this factor, the courts

compare all aspects of the products, including price, style, intended use, target clientele, typical

distribution channels, and others." *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324,

335 (S.D.N.Y. 2013) (quoting *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305,

316 (S.D.N.Y. 2000)).  The post-sale context differs in at least one respect.  In the initial-interest

and point-of-sale context, it is relevant that the products sell at similar price points through

similar distribution channels.  In the post-sale context, it is not fatal to a determination of

infringement that the original and the accused products sell at similar different price points or

through distinct channels.  *See Clinique Lab'ys, Inc.*, 945 F. Supp. at 554.  The point of post-sale

confusion is that the senior user is injured when products confusingly similar to its own are

offered through different channels and at a lower price point, thereby cheapening the senior

user's image of exclusivity and quality and the value of its mark.  Injury occurs when a consumer

seeing a product that appears to be that of the trademark owner's is induced to believe that the

owner has decided to enter into a different market segment.  *See Levi Strauss & Co*., 799 F.2d at

874.  "Motivated by this mistaken notion—[Plaintiff]'s goodwill—the consumer might then buy

[the Accused Products] even after discovering his error."  *Id.*

This factor favors Plaintiff.  The likelihood of such confusion is particularly acute here

when the products at issue both concern jewelry.  Both products serve the same function.  The

aesthetic of both products is "Gothic" and "alternative," and it is evident that the "borrower's

use" is not "so foreign to the owner's as to insure against any identification of the two."  *Id.*

(quoting *Yale Electric Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir. 1928) (Hand, J.)); *see also*

*Jackpocket, Inc.*, 2022 WL 17733156, at *41 ("Because both parties are competing for the same

consumers in the same marketplace, the competitive proximity factor favors Plaintiff.").  There

appears to be a price difference, but such a price difference would bolster post-sale confusion by

allowing the purchasers to don a "cheap knockoff copy of the original manufacturer's more expensive product, thus allowing a buyer to acquire the prestige of owning what appears to be the more expensive product." *Hermes Int'l*, 219 F.3d at 108.  The Defendants' sale of the Accused Products could saturate the market and undermine the exclusivity and prestige upon which Plaintiff relies and which its marks represent.  "Weighing all of these considerations, the proximity of the products is sufficiently close to create some likelihood of confusion." *Clinique Lab'ys, Inc.*, 945 F. Supp. at 555.

### iv.   Evidence of Consumer Confusion

Neither party has submitted evidence of consumer confusion.  That, however, is likely a function of the fact that Defendants have only had minimal sales of the Accused Products.  It is not a bar to summary judgment.  *See Levi Strauss & Co*., 799 F.2d at 875 (noting in a case involving post-sale confusion, that "it is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source"); *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 523 (S.D.N.Y. 2009) ("Although Pfizer has not submitted evidence showing actual confusion, the absence of such evidence is not fatal to finding a likelihood of confusion.").  "It would be unfair to penalize [Plaintiff] for acting to protect its trademark rights before serious damage has occurred." *Levi Strauss & Co*., 799 F.2d at 875.  The factor thus "neither weighs in favor nor against a likelihood of confusion." *Pfizer Inc.*, 652 F. Supp. 2d at 523.

### v.   Bad Faith

For the reasons described in Section II, Plaintiff has not shown that any infringement occurred in bad faith.  This factor cuts in favor of Defendants.

### vi.   Respective Quality of the Products

"The quality of a junior user's products 'is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality.'"   *Jackpocket, Inc.*, 2022 WL 17733156, at *50 (quoting *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 965 (2d Cir. 1996)).  Where the accused products are "of an inferior quality," the trademark owner has a greater "interest in protecting its reputation from debasement."  *Levi Strauss & Co.*, 799 F.2d at 875.  Plaintiff has offered evidence, which is not contradicted, that, as a result of its marketing, its marks have come to symbolize a certain type of value.  *See, e.g.*, Dkt. No. 98 ¶¶ 5, 13.  Its products are made of sterling silver.  Defendants are made from steel.  *Id.* ¶ 25; Dkt. No. 104-4; Dkt. No. 105 ¶ 21.  Distribution of Defendants' Accused Products would run a risk of jeopardizing Plaintiff's reputation.  Although this factor is "less important" than others "because '[t]he concern that casual observers will attribute an infringing product's low quality to the owner of the mark is reduced in post-sale confusion cases, as such persons are not in a position to examine a product's construction and materials,'" *Guess Am., Inc.*, 868 F. Supp. 2d at 240, the factor nonetheless favors Plaintiff.

### vii.   Sophistication of the Relevant Consumers

Finally, while the sophistication of the relevant customers typically concerns whether the consumer at the point-of-sale will be able to "examine[] a product before purchase" and distinguish between the marks, *see Jackpocket, Inc.*, 2022 WL 17733156, at *51, it plays a somewhat different role in the post-sale context.  "[P]oint-of-sale confusion is concerned with confusion among direct purchasers—who, in the fashion market, tend to be sophisticated." *Gucci Am., Inc.*, 868 F. Supp. 2d at 240.  However, "post-sale confusion is concerned with confusion among casual observers, who may or may not be purchasers."  *Id.*; *see also Hermes Int'l*, 219 F.3d at 108.  Those members of the "general public" may "perceive[e] the junior user's

product after it has been purchased and associat[e] the product with the senior user's product." *Montblanc-Simplo v. Aurora Due S.r.L.*, 363 F. Supp. 2d 467, 478 (E.D.N.Y. 2005). Moreover, the Circuit has held that "in the post-sale context, the sophisticated buyer is more likely to be affected by the sight of [the plaintiff's mark] on [the defendant's product] and, consequently, to transfer good will." *Levi Strauss & Co*., 799 F.2d at 875. The result would be to undermine the value of Plaintiff's mark and to decrease its incentive to invest in that mark.

Thus, Defendants' argument—that because the products are expensive luxury goods that "cater to celebrities and wealthy individuals," such direct "consumers" may be discerning—is unavailing. Dkt. No. 101 at 13. The harm in a post-sale context is the confusion "not just among high-end consumers, but among the general public." *Hermes Int'l*, 219 F.3d at 108. This factor marginally favors Plaintiff.

\* \* \*

Viewed in combination, the factors tend to favor Plaintiff on the CH Cross and the CH Plus marks, but not on the Dagger Mark. The relative strength of the CH Cross and the CH Plus marks—for the most part, undisputed by Defendants—in combination with their substantially similarity as they appear on Defendants' products, as well as the inferior nature of Defendants' products, support the grant of summary judgment in favor of Plaintiff that the Flower Cross Earrings, Patonce Cross Bracelet, Cross-Bracelet, Flower Cross Bracelet, and Flower Cross Punk Unisex Studs Leather Bracelet, are products that create a likelihood of confusion in the post-sale context. The motion for summary judgment is denied as to the Dagger Mark. A reasonable jury could find that Defendants have not infringed with respect to the Dagger Mark. The Court now proceeds to assess whether the Marks are counterfeit.

**b.      Whether the Marks are Counterfeit**

To determine whether the marks are counterfeit, the Court considers whether the "two marks [are] nearly identical . . . with only minor differences which would not be apparent to an unwary observer," *Louis Vuitton Malletier S.A.*, 97 F. Supp. 3d at 499 (internal quotation marks omitted), and "asks whether an average purchaser would find the allegedly counterfeit mark to be 'substantially indistinguishable' from the registered mark as it appears on the actual merchandise," *Fischer v. Forrest*, 2017 WL 128705, at *13.  The CH Cross and the CH Plus marks, in this respect, bear striking likeness as they appear on Chrome Hearts' products to the marks that appear on several of the Accused Products.  The CH Cross and the CH Plus both bear three protruding grooves for each of the four "arms" of the cross and the plus.  Each of the four arms of the CH Plus is equivalent in length.  The two vertical arms of the CH Cross, however, differ in length.  The centers of both the CH Cross and the CH Plus are punctuated by a circle.  Each of the arms, on both the CH Cross and the CH Plus, terminate in three points and all three points are equidistant in width.  The marks on five of the Accused Products—the Flower Cross Earrings, the Patonce Cross Bracelet, the Cross-Bracelet, the Flower Cross Bracelet, and the Flower Cross Punk Unisex Studs Leather Bracelet—also exhibit four arms composed by three protruding grooves.[14]  The marks on each of these Accused Products also are punctuated by a circle where the arms meet.  The vertical arms on both the Patonce Cross Bracelet and the Cross-Bracelet appear to extend to an identical proportion to those appearing on Plaintiff's products.  The curvature and angles of the end of the grooves are also similar in shape.

---

[14] The Court finds unpersuasive Defendants' argument that the CH Cross and CH Plus marks have four distinct lines for their arms, while the marks on Plaintiff's products only exhibit three.  *See* Dkt. No. 87 at 13.  The "fourth" line is merely indicative of the protrusion of the middle groove.  In any event, the distinction is minimal enough that it is substantially indistinguishable.

The differences between the marks on the Accused Products and the marks of the CH Cross and CH Plus are trivial. The vertical arms for the Flower Cross Earrings are equal in length (but differ in length from the horizontal arms), while those of the CH Cross are not equal. The level of protrusion for the grooves for the Cross-Bracelet appears to be less so than the marks that appear on Plaintiff's products. The downwards-pointing arm on the mark on the Cross-Bracelet also appears to conclude at a marginally larger width than the upwards-pointing arm. "Courts in this Circuit have found a mark to be counterfeit even if it has 'minor differences' from the original." *Louis Vuitton Malletier S.A.*, 97 F. Supp. 3d at 500 (citing cases). The marks on the Patonce Cross Bracelet, the Flower Cross Bracelet, and the Flower Cross Punk Unisex Studs Leather Bracelet otherwise appear to be very similar, if not identical, to those of the CH Cross and the CH Plus marks. Summary judgment is granted in favor of Plaintiff that the marks on those products, as well as the Flower Cross Earrings and Cross-Bracelet, are counterfeit.

The Court, however, grants summary judgment in favor of Defendants on the Dagger mark and the No Fear Steel Dagger Necklace. The differences of the infringing mark and the Dagger mark are not trivial. They are not merely "substantially indistinguishable." Most importantly, the "No Fear Steel Dagger Necklace" contains a block letter imprint of "TRUENiRAVEN" horizontally across the hilt of the dagger. Plaintiff does not produce any images of the Dagger mark as it appears in the marketplace except for a version that imposes the phrase "CHROME HEARTS" on the hilt and down the blade of the dagger, although it asserts infringement based on the federal registration without the use of the phrase in the design. Further, the dagger in the Accused Product has numerous etchings and divots in the blade, while Plaintiff's design does not. Finally, the protrusions in the handle of the blade are differently

sized from those of the Dagger mark.  Those differences, in combination—particularly with the different wording—show this is not an identical or substantially indistinguishable Chrome Hearts mark.  *See GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 472 (S.D.N.Y. 2011), *aff'd sub nom. GMA Accessories, Inc. v. Elec. Wonderland, Inc*., 558 F. App'x 116 (2d Cir. 2014) ("[T]he words 'Charlotte Solnicki' were used on the actual labeling of the goods in Electric Wonderland's showroom. 'Charlotte Solnicki' is simply not identical with or substantially indistinguishable from 'Charlotte.'"); *cf. Birmingham v. Mizuno USA, Inc*., 2011 WL 1299356, at *8 (N.D.N.Y. Mar. 31, 2011) (noting that appearance of "Softhands" trademark did not support counterfeiting in part because "Defendant does not use the word 'Softhands' by itself; rather, Defendant uses the word in tandem with the word 'Construction.'").

## II.   **Willfulness and Bad Faith**

Defendants move for summary judgment that they did not infringe on any trademarks willfully or in bad faith.  Dkt. No. 87 at 14–16.  Plaintiff likewise moves for summary judgment that Defendants sold the products in bad faith.  Dkt. No. 93 at 22–24.  Summary judgment is granted in favor of Defendants on the questions of willfulness and bad faith.

"To prove willfulness, a plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard or willful blindness."  *Innovation Ventures, LLC*, 176 F. Supp. 3d at 164; *see also 4 Pillar Dynasty LLC v. New York & Co., Inc*., 933 F.3d 202, 209–10 (2d Cir. 2019).  The standard for willfulness is "whether the defendant had knowledge that [his] conduct represented infringement or perhaps recklessly disregarded the possibility."  *Kepner–Tregoe, Inc. v. Vroom*, 186 F.3d 283, 288 (2d Cir.1999) (quoting *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd*., 996 F.2d 1366, 1382 (2d Cir. 1993)).  "Reckless disregard for the possibility of infringement may be found when the infringer should have known – for instance, by virtue of his occupation – that the particular acts

would constitute infringement." *U.S. Media Corp., Inc. v. Edde Entm't, Inc.*, 1996 WL 520901, at *7 (S.D.N.Y. Sept. 12, 1996).  "[W]illful blindness means that a defendant knew it might be selling infringing goods but nevertheless 'intentionally shielded itself from discovering' the truth." *Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 F. App'x 26, 31 (2d Cir. 2013) (quoting *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 109 (2d Cir. 2010)).  "[K]nowledge may be actual or constructive.  In other words, it need not be proven directly but may be inferred from the defendant's conduct." *N.A.S. Import, Corp. v. Chenson Enter., Inc.*, 968 F.2d 250, 252 (2d Cir. 1992) (internal citation omitted).

As for the similar inquiry of bad faith, the inquiry into "bad faith 'considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between his and the senior user's product.'" *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 440 F. Supp. 2d 249, 278 (S.D.N.Y. 2006) (quoting *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 460 (2d Cir. 2004)).  "Bad faith may be inferred from the junior user's actual or constructive knowledge of the senior user's mark." *Star Indus., Inc.*, 412 F.3d at 389.  The Second Circuit has "never held adoption of a mark with no knowledge of a prior similar mark to be in bad faith even in the total absence of a trademark search, much less on the basis of an allegedly flawed trademark search." *Id*. at 388.  "[I]n some cases even where a trademark search resulted in knowledge of the earlier mark, in the absence of additional evidence indicating an intent to promote confusion or exploit good will or reputation, this Court has found the junior user to be in good faith." *Id*.  "Evidence of intentional copying by a junior user may be indicative of an intent to create a confusing similarity between the products." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1044 (2d Cir.

1992); *see also Goat Fashion Ltd. v. 1661, Inc.*, 2020 WL 5758917, at *13 (S.D.N.Y. Sept. 28, 2020).

      The Court grants Defendants summary judgment denying any finding of willfulness or bad faith.  Plaintiff has not identified sufficient evidence for a jury question on willfulness or bad faith.  Plaintiff asserts that Kung must have had prior knowledge of Plaintiff's marks, based primarily on Kung's testimony that he came to "know th[e] *brand*" because he "saw . . . the store in . . . Las Vegas."  Dkt. No. 104-3 at 23–24 (emphasis added).  Plaintiff then attempts to draw a series of tenuous and speculative links to Kung's purported knowledge of the marks at issue, by pointing out that the logo outside the store is accompanied by one of the marks, and that there are glass windows that may have potentially allowed Kung to see Plaintiff's products.  Dkt. No. 93 at 23.  But Kung never testified that he viewed or paid any attention to the logo, that he went in the store, or even that he looked through the windows at Plaintiff's products.  In fact, Kung testified the opposite, stating that he "just noticed the name."  Dkt. No. 104-3 at 24.  He was asked in his deposition only how he came to "know that brand," rather than any marks of Chrome Hearts in particular.  *Id.* at 23.  Plaintiff's speculation as to what Kung saw, did, and paid attention to, is insufficient to establish a genuine issue of material fact, as "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Baines*, 593 F.3d at 166 (citation omitted).[15]  Further, even if Kung had seen the logo, there is nothing to indicate that he would have understood it to be a protected

---

[15] It is similarly entirely speculative to draw a link between the name of Defendants' products—which use the name "Flower" and "Dagger" and knowledge of the marks or the products, *see* Dkt. No. 102 at 22, when in fact Defendants products depict (although Plaintiff's attorney may disagree), a flower cross and a dagger.

mark,[16] which even then, alone, would not necessarily give rise to a finding of bad faith.  *See Miss Universe, L.P., LLLP v. Villegas*, 672 F. Supp. 2d 575, 589 (S.D.N.Y. 2009) ("[K]nowledge of a senior user's trademark does not necessarily give rise to an inference of bad faith.").  Kung declares under the penalty of perjury that from that Las Vegas trip, "only knew the *name* Chrome Hearts because [he] walked past their elaborate store front in Las Vegas one time," and "[u]ntil this lawsuit was filed," "had no knowledge of any of Chrome Hearts individual designs, including those at issue in this case."  Dkt. No. 86 ¶ 12 (emphasis added).  *See Aceto Agr. Chemicals Corp. v. Bayer Aktiengesellschaft*, 2012 WL 3095060, at *11 (S.D.N.Y. July 30, 2012), *aff'd*, 531 F. App'x 103 (2d Cir. 2013) ("Both of Aceto's witnesses testified that they were not aware of Bayer's PROLINE mark . . . .  The Court credits this testimony.").  That statement is unrefuted.  It is entirely consistent with Kung's testimony and is not a sham.  *See Savarese v. City of New York*, 547 F. Supp. 3d 305, 328 (S.D.N.Y. 2021) (providing that sham affidavit is one that "contradicts his own testimony").  In short, Plaintiff's theory of Kung's

---

[16] Plaintiff's reliance on Kung's testimony that he was hesitant to sell because there was a "logo that's involved" is misplaced.  The testimony is ambiguous as to what Kung meant, what he was referring to, and when he learned that there was a logo involved.  The full line of questioning is as follows:

> Q:    Okay. And was Controse offering this product for sale prior to January 2021?
> A:    Prior? Before? Yes.
> Q:    Before.
> A:    Yes. But I --
> Q:    Do you recall how --
> A:    I don't have a record. I bought this item on 2015. I would say we -- we launch it on one year after. Yeah, we don't -- we don't really want to sell this. We don't -- we just studied -- studied the design. And then because -- in it, so we studied the design. So but I did not -- there's a -- there's a logo that's involved. Yeah.

Dkt. No. 104-3 at 37.  That testimony is too attenuated to forestall summary judgment.  Under Rule 56, a mere "scintilla of evidence" is insufficient to create a genuine issue of fact; "there must be evidence on which the jury could reasonably find for the" non-movant.  *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (citation omitted); *see also Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) ("Nor may a party rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.").

reckless disregard or willful blindness is entirely speculative; there are no other red flags

provided that would warrant a finding of willfulness or bad faith.  *See, e.g.*, *Island Software &*

*Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005) (finding reckless

disregard when a customer called to complain about counterfeit merchandise, and the record

indicated that defendant "squirmed" while dealing with someone who he acknowledged was not

a "regular distributor").

    Irrespective of whether Defendants had or should have had knowledge of the mark, the

remainder of the undisputed record shows no "intent to promote confusion or exploit good will

or reputation."  *Star Indus., Inc.*, 412 F.3d at 389; *see also Black Diamond Sportswear, Inc. v.*

*Black Diamond Equip., Ltd.*, 2007 WL 2914452, at *3 (2d Cir. Oct. 5, 2007) (stating that that a

"junior user's knowledge of the mark may still be consistent with good faith unless the evidence

indicates an intent to promote confusion or exploit good will or reputation" (internal quotation

marks omitted)).  The number of jewelry items purchased and sold are miniscule.  Kung only

bought twenty stainless steel items in six different styles for a total of $101.92 in cash and for the

purpose of researching their designs and to study their weight and quality.  Dkt. No. 86 ¶¶ 5–8;

Dkt. No. 86-2.  Those jewelry items were not designed by Kung and Kung did not know whether

the wholesalers designed them.  Dkt. No. 104-3.[17]  Kung declared his understanding that he

---

[17] Plaintiff's argument that the infringing products were the only ones that Kung did not design, Dkt. No. 93 at 24, has no basis in the record.  Plaintiff, in its Rule 56.1 Statement, asserts that Kung stated that he designed "all" of the products by Controse.  But that statement of "all" is found nowhere in Kung's testimony, and Plaintiff has conceded this by correcting the record to say "most."  Dkt. No. 115 at 2.  Kung has also provided a supplemental declaration showing additional pieces sold by Controse that were not designed by him.  Dkt. No. 100-1.  Plaintiff's further assertion that Kung did not buy any other jewelry on that trip is unsupported by the record.  Dkt. No. 93 at 24.  Plaintiff elicited no testimony on whether Kung visited any other wholesalers or made any other purchases; all that Kung testified to was that those items were all that he bought from Jin Yan and Steel Soldier.  *See* Dkt. No. 104-3 at 55, 57.

purchased a small enough quantity to be exempt from any requirement to declare these items to U.S. customs.  Dkt. No. 106 ¶ 8.  He then sold only a total of 14 out of the 20 items for a total of $298.71, because he didn't "want to waste any money," with three of those items purchased by Plaintiff's attorney in March 2021.  Dkt. No. 86 ¶¶ 9–10; Dkt. No. 104-3 at 26–27, 32–37, 44–46; Dkt. No. 104-7 at ECF p. 76.  Those items were sold on a website that sells "tattoo inspired jewelry and accessories" and states that "[o]ur brand and pieces fit into your Althernative [sic] and Gothic style."  Dkt. No. 98 ¶ 22; Dkt. No. 104-4 at ECF p. 15.  The website further describes it as a "edgy, raw yet artful look – much like tattoos," that "they make you feel and look unique," and that it is "inspired by the popular tattoo styles and looks."  Dkt. No. 104-4 at ECF p. 15.  In other words, it was entirely consistent with the style of products that Controse regularly sold. Kung did not have any further communications with either of the wholesaling companies that he bought from.  Dkt. No. 104-3 at 62–63.  It is further undisputed that there was no mention of Chrome Hearts on the packaging, advertising, or website; they were entirely under Controse's name.  Dkt. No. 86 ¶¶ 13–16.  *See Kelly-Brown v. Winfrey*, 717 F.3d. 295, 312–13 (2d Cir. 2013).  Once Kung received notice of the suit, he immediately took the Accused Products down from the website.  Dkt. No. 86 ¶ 18.  *Cf. City of New York by & through FDNY v. Henriquez*, 2023 WL 2186340, at *22 (E.D.N.Y. Feb. 23, 2023), *reconsideration denied*, 2023 WL 4490287 (E.D.N.Y. Apr. 16, 2023) (finding bad faith when the junior user continued to use the marks after permission was withdrawn).  Kung also declares that Controse at no time intended to mislead or confuse consumers that this jewelry was Chrome Hearts products, and at no time did he ever believe that they were purchasing Chrome Hearts products or replicas.  Dkt. No. 86 ¶ 14. Plaintiff has not introduced any evidence that would cast doubt on this representation.  *See*, *e.g.*, *Goat Fashion Ltd.*, 2020 WL 5758917, at *13 ("Goat Fashion has not offered any evidence that

1661 used the mark to sell apparel with the intent of confusing customers or capitalizing on Goat Fashion's reputation.").[18]

## III.   Punitive Damages

Defendants argue that Plaintiff's prayer for relief for punitive damages must be dismissed as a matter of law.  Dkt. No. 87 at 17.  Plaintiff argues that the question of punitive damages should remain for the jury because it involves the question of willfulness and again argues that Defendants engaged in "deliberate disregard" of its trademark rights.  Dkt. No. 102 at 24. "Plaintiff may obtain punitive damages under on its New York state law causes of action only if Defendant's conduct constitutes 'gross, wanton, or willful fraud or other morally culpable conduct' to an extreme degree.'"  *RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc*., 527 F. Supp. 3d 305, 331 (E.D.N.Y. 2021) (quoting *Smith v. Lightning Bolt Prods., Inc*., 861 F.2d 363, 371 (2d Cir. 1988)).  As there is insufficient evidence to present a genuine dispute of fact that Defendants willfully infringed on any of Plaintiff's marks, there is also insufficient evidence as a matter of law to award Plaintiff punitive damages under New York state law.  *Cf. Innovation Ventures, LLC*, 176 F. Supp. 3d at 165 (declining award of punitive damages because statutory damages under the Lanham Act for willful behavior includes a punitive component); *Malletier v. Carducci Leather Fashions, Inc*., 648 F. Supp. 2d 501, 506 (S.D.N.Y. 2009) (same); *Braun, Inc. v. Optiva Corp*., 2000 WL 1234590, at *4 (S.D.N.Y. Aug. 31, 2000) (stating that the standard of relief for punitive damages parallels "fraud or bad faith" standard required for an award of attorney's fees under the Lanham Act).

---

[18] Because bad faith is an element of unfair competition under New York common law, *see Coca–Cola North America v. Crawley Juice, Inc*., 2011 WL 1882845, at *6 (E.D.N.Y. May 17, 2011) ("[T]he essence of an unfair competition claim is that the defendant has misappropriated the labors and expenditures of another and has done so in bad faith."), and because Plaintiff has not proffered sufficient evidence showing willfulness or bad faith, summary judgment is granted dismissing Plaintiff's unfair competition claim under New York law.

**CONCLUSION**

Plaintiff's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Plaintiff's motion to seal is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 69, 71, 72, 85, 92.

SO ORDERED.

Dated: August 8, 2023
     New York, New York

                                        LEWIS J. LIMAN
                                United States District Judge